NO. 93-166

IN THE SUPREME COURT OF THE STATE OF MONTANA

1994


JIM'S EXCAVATING SERVICE, INC.,
a Montana Corporation,

       Plaintiff/Respondent/
       Cross-Appellant

   v.

HKM ASSOCIATES, a Montana
Corporation,

       Defendant/Appellant.



FILED

JUN 12 1994

CLERK OF SUPREME COURT
STATE OF MONTANA


APPEAL FROM:   District Court of the Thirteenth Judicial District,
                 In and for the County of Yellowstone,
                 The Honorable Robert W. Holmstrom, Judge presiding.


COUNSEL OF RECORD:

       For Appellant:

           Neil G. Westesen and Donald L. Harris,
           Crowley, Haughey, Hanson, Toole & Dietrich,
           Billings, Montana

       For Respondent:

           Stephen D. Bell and Robert L. Sterup,
           Dorsey & Whitney, Billings, Montana

       For Amicus:

           John F. Sullivan, Hughes, Kellner,
           Sullivan & Alke, Helena, Montana
           (Consulting Engineers Council of Montana
           and Montana Technical Council)


                   Submitted on Briefs:   April 21, 1994

                           Decided:   July 12, 1994

Filed:

Justice James C. Nelson delivered the Opinion of the Court.

Jim's Excavating Service, Inc. (JES), brought this action against the engineering firm of HKM Associates, (HKM), in the District Court of the Thirteenth Judicial District, Yellowstone County, claiming delay and extra work damages as a result of HKM's negligent design and supervision of the Lockwood Water User's Association water pipeline project. The jury returned a verdict in the amount of $381,000.00. HKM appeals and JES cross appeals on the issue of prejudgment interest. We affirm.

The following issues are raised on appeal:

I.   Did the District Court err by permitting JES to sue HKM in tort to recover purely economic damages?

II.   Did the District Court err by refusing to admit evidence that J-M's pipe representative, Vince Pacifico, informed JES at the beginning of the construction project that J-M's 24-inch PVC pipe could not be deflected?

III. Did the District Court err by permitting JES's damage expert to give his opinion concerning the damages JES incurred where the expert relied upon business records and long-accepted methodology?

IV.   Did the District Court err by denying HKM's motion for a judgment notwithstanding the verdict (JNOV) or in the alternative a motion for a new trial?

V.   Did the District Court err by failing to reduce the jury award against HKM by the amount JES received from settling with LWUA, J-M, and Northwest Pipe?

VI.   Did the District Court err in denying JES's motion for prejudgment interest?

FACTUAL BACKGROUND

This litigation arises out of the construction of a water transmission pipeline for the Lockwood Water Users Association (LWUA).  LWUA retained HKM, a Billings based engineering firm, to

2

design the plans and specifications for the project. HKM also acted as project engineer through the entire project, from the design stage through completion. JES , a Billings construction contractor, was the low bidder on the project, and LWUA awarded the contract to JES in August 1985. The contract required JES to construct a water transmission main using 16-inch and 24-inch pipe.

A portion of the pipeline was to be laid through what is known as the "S" curve on Cerise Road. To negotiate this curve, the pipe would either have to be capable of being deflected at the joint, or special fittings would have to be installed. The project was originally designed to use ductile iron pipe, which is capable of deflection at the joint. Therefore, the plans and specifications on the original bidding and contract requirement forms issued in July 1985, did not call for fittings for the "S" curve on Cerise Road. Six days prior to releasing the bid, HKM issued an addendum to the bid forms requesting an alternate bid using polyvinyl chloride (PVC) pipe.

While designing the pipeline, J-M Manufacturing Co., Inc. (J-M), informed HKM's principal engineer Steve Quail, that the 24-inch PVC pipe could be deflected at the joint up to $3^{\circ}$. Relying on this information, Quail determined that the PVC pipe could be laid through the "S" curve without special fittings. Therefore, the addendum to the bid forms did not include any specifications that fittings be used for the "S" curve on Cerise Road.

JES submitted a bid which included the alternative bid for PVC pipe, and as stated above, was awarded the contract. JES decided

to buy PVC pipe manufactured by J-M, from Northwest Pipe Fittings, Inc. (Northwest Pipe). JES had Northwest Pipe provide the required pipe information and certification to HKM. The submittal informed HKM that 24-inch PVC pipe manufactured by J-M would be used on the project. Included in the submittal was a deflection table indicating that the 24-inch pipe could be deflected up to $3^0$ at the joint without fittings. Steve Quail called Northwest Pipe to verify that the deflection table applied to PVC pipe, and upon Northwest Pipe's assurance that the PVC pipe net the criteria listed in the deflection table, Quail determined that the proposed submittal satisfied the design plans and specifications, and approved the submittal without exception.

Construction on the project began in September 1985. By the spring of 1986, JES was ready to lay the pipe at Cerise Road. The 24-inch pipe to be installed for this part of the project was delivered on April 10, 1986. Shortly thereafter, on April 18, 1986, a J-M representative told JES the pipe could not be deflected. Therefore fittings would have to be installed in order to negotiate the Cerise Road "S" curve. Because fittings had not been indicated for the Cerise Road portion of the project, JES had not ordered any, and none were immediately available. Construction of the pipeline effectively stopped until the fittings arrived. JES did complete the straight sections of the project while waiting for the fittings, and continued to work until May 6 or 7, 1986. The fittings arrived on July 14, 1986. However, JES was not able to resume work until their subcontractors had Worker's Compensation

4

insurance. JES resumed work August 28, 1986. on September 4, 1986, there was a break in the Cenex gas line in the immediate area of the project. The area was evacuated by the sheriff, and the project was shut down. On September 10, HKM inspected the 24-inch fittings and discovered that the cement linings of the fittings were cracked and had to be returned for repair. The new fittings did not arrive on the project until October 5, or 6, 1986.

While waiting for the equipment, JES could not do other work because its bonding was tied up, and because it had to keep its equipment on standby so that it would be available to begin work once the fittings did arrive. JES felt it was not free to use the equipment on a long-term basis on any other job. Due to the delay JES suffered economic loss.

## PROCEDURAL BACKGROUND

JES filed a complaint against HKM and LWUA on May 8, 1987. The complaint contained a series of Counts, some in the nature of alternate theories of recovery, some in the nature of separate claims, some applicable to defendant HKM only, some applicable to defendant LWUA only, and some applicable to both defendants jointly. LWDA counterclaimed against JES and JES filed a third party complaint against Northwest Pipe and J-M, asking to be indemnified from the claims set forth in the LWUA's counterclaim.

Prior to trial, JES entered into a settlement agreement with LWUA whereby LWUA paid JES a total of $135,000 and dismissed the counterclaim asserted against JES. JES also entered into a settlement agreement with Northwest Pipe and J-M, whereby the sum

5

of $135,000 was paid to JES in satisfaction of the claims asserted by JES against Northwest Pipe and J-M. By the terms of the agreements, JES did not release the claims it possessed against HEM. Therefore the remaining parties to the action were JES and HKM.

Following the settlements, JES filed an amended complaint against HKM only on March 7, 1989. The amended complaint incorporated some of the theories contained in the original complaint which named LWUA as co-defendant. The amended complaint alleged among other things, that HEM as project engineer owed JES, as contractor, a duty to act as a reasonable prudent member of its profession in its preparation of the contract plans and specifications, in its overall design of the project, in its direction, supervision and administration of the contract work, and its recommendations to the Project Owner with regard to contract payments and disputes. JES sought recovery of direct and consequential damages incurred as a result of HKM's negligent design.

A jury trial was held August 3 through 13, 1992. After certain pretrial motions, the case was submitted to a jury upon a negligence theory and the jury was asked to determine whether HKM was negligent in preparing the plans and specifications of the project and if so: whether HKM's negligence was a cause in fact of JES's damages: whether HKM's negligence was the proximate cause of damages to JES; and the amount of damages sustained by JES as a result of HKM's negligence. The jury was also asked whether JES

6

was negligent, and if so, was the negligence of JES the cause in fact of its damages. The jury by its special verdict, determined that HKM was negligent and that its negligence was the cause in fact and proximate cause of JES's damages. The jury also determined that JES was negligent, but its negligence was not the cause in fact of its damages. The jury determined JES's damages to be in the amount of $381,000.

After trial HKM moved for a pro *tanto* reduction of the jury verdict. HKM argued that the $381,000 damage award should be reduced by $270,000, to reflect the compensation JES received from settling with LWUA, J-M, and Northwest Pipe. The District Court denied the motion, and entered judgment in favor of JES on October 30, 1992. HKM then moved for a judgment notwithstanding the verdict or in the alternative for a new trial. HKM based its motion in part on the argument that absent privity of contract, as a matter of law, HKM owed no duty to JES, and therefore JES could not bring a negligence action directly against HKM. After considering the briefs of both parties, the District Court denied this motion on December 17, 1992.

HKM appealed to this Court from this judgment, and JES cross appealed an order denying JES's motion for prejudgment interest.

## I. ECONOMIC LOSS DOCTRINE

Did the District Court err by permitting JES to sue HKM
in tort to recover purely economic damages?

HKM argues that because there was no contractual privity between JES and HKM, the District Court could not, as a matter of law, impose purely economic tort liability upon HKM. Our standard

7

of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603. Therefore, we must determine if the District Court erred in determining that JES was not as a matter of law precluded from bringing a negligence action against HKM absent privity of contract between the two.

HKM asks this Court to adopt the economic loss doctrine which provides that a contractor or subcontractor may not sue a design professional in tort for economic damages, i.e., delay damages and the cost of extra work. Rather, HKM argues, the parties should be required to pursue their contract remedies, and resolve the dispute in accordance with the law of contracts. Although this Court has not addressed this specific question, the majority of jurisdictions have done so and have rejected the economic loss doctrine. See generally Annotation, Tort Liability of Project Architect for Economic Damages Suffered by Contractor, 65 A.L.R.3d 249 (1975).

In the instant case, the District Court rejected HKM's arguments that the economic loss doctrine precluded JES as a matter of law, from recovering economic damages from HKM. The District Court determined that HKM "had a duty to use ordinary care and diligence in rendering its professional services in the preparation of the plans and specifications," and allowed JES to establish a breach of that duty and the resulting damage to it, entitling JES to recover. HKM alleges that this decision was in error.

Montana law requires that engineers exercise the care and

8

competence expected of members of their profession. **Morrison-Maierle, Inc. v. Selsco (1980),** 186 Mont. 180, 185, 606 **P.2d** 1085, 1088. **HKM** argues however, that an engineer only has a duty to the owner, and that duty arises from the contract between them. Because there was no contractual privity between **HKM** and JES, HKM contends that it owes no duty to JES.

This argument ignores the established law in Montana abolishing the requirement of privity of contract to maintain an action in tort. Hawthorne v. Kober **Const.** Co. **(1982),** 196 Mont. 519, 640 **P.2d** 467; Tynes v. Bankers Life Co. **(1986),** 224 Mont. 350, 730 **P.2d** 1115. In <u>Hawthorne,</u> the case rejecting the privity requirement, a subcontractor asserted claims against the general contractor and the general contractor's steel supplier. The subcontractor alleged that he suffered economic damages as a result of the steel supplier's delay in delivering steel. The District Court granted partial summary judgment in favor of the steel supplier finding that the subcontractor could not maintain an action against the steel supplier because there was no privity of contract. This Court reversed the District Court holding that privity of contract is not required to maintain an action grounded in negligence. We adopted the following reasoning from Prosser, Law of Torts, § 93 (4th ed. 1971):

> . . . by entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct which may be expected to affect the interests of

9

another person.

> . . . there are situations in which the making of the contract creates a relation between the defendant and the promisee, which is sufficient to impose a tort duty of reasonable care. By the same token, there are situations in which the making of a contract with A may create a relation between the defendant and B, which will create a similar duty toward B, and may result in liability for failure to act.

Hawthorne, 640 P.2d at 470.

In addition, as stated above, the clear trend in other jurisdictions is to allow a negligence action for economic loss without direct privity of contract. See for example, Mattingly v. Sheldon Jackson College (Alaska 1987), 743 P.2d 356; Donnelly Const. Co. v. Oberg/Hunt/Gilleland (Ariz. 1984), 677 P.2d 1292; Bacco Const. Co. v. American Colloid Co. (Mich.App. 1986), 384 N.W.2d 427; A. Moyer, Inc. v. Graham (Fla. 1973), 285 So.2d 397. For example, in Bacco Constr. Co. v. American Colloid, the Michigan Court of Appeals allowed a contractor to bring a negligence action against a project engineer absent contractual privity. Bacco, 384 N.W.2d at 434. The Michigan court concluded that:

> It is certainly foreseeable that an engineer's failure to make proper calculations and specifications for a construction job may create a risk of harm to the third-party contractor who is responsible for applying those specifications to the job itself. The risk of harm would include the financial hardship created by having to cure the defects which may very well not be caused by the contractor.

Bacco, 384 N.W.2d at 434. Bacco adopted the reasoning of an Arizona case, Donnelly Const. Co. v. Oberg/Hunt/Gilleland. In that case, a contractor brought a negligence claim against the architects alleging that the architect's plans and specifications

10

contained errors which resulted in increased construction costs. Donnelly, 677 **P.2d** at 1293-94. The architect moved to dismiss the action based in part on the fact that there was no privity of contract. The district court granted the motion. Donnelly, 677 **P.2d** at 1294. The Supreme Court of Arizona reversed and remanded, holding that the claim should be allowed, in spite of the lack of privity. Donnelly, 677 **P.2d** at 1296. The Arizona court concluded that it was foreseeable that the contractor, hired to follow the plans and specifications prepared by the architect, would incur increased costs if those plans were not accurate. Donnelly, 677 **P.2d** at 1295-96.

HKM argues that our decision in Thayer v. Hicks **(1990)**, 243 Mont. 138, 793 **P.2d** 784, which addressed the extent of negligence liability accountants have to third parties with whom they are not in privity of contract, is applicable to the instant case. **HKM** maintains that Thayer stressed the necessity of some sort of connection or **"quasi-privity"** before tort liability could be imposed on a professional.

In Thayer, this Court examined three approaches to accountant liability to third parties: (1) the **"near** privity" concept from Credit Alliance Corp. v. Arthur Andersen & Co. (N.Y. **1985),** 483 **N.E.2d** 110, which limits the duty of care to those third parties who are actually known to the accountant: (2) the "actually foreseen" rule from the Restatement (Second) of Torts § 552 **(1977),** which provides that the accountant foresee and intend members of a limited class will rely on his representations: and (3) the

11

"ordinary negligence **rule**" which holds accountants liable to all who might reasonably and foreseeably obtain and rely upon the accountant's work product. Thaver, **793 P.2d** at 788-89.

Thaver adopted a modified version of the Credit Alliance test, which provides:

> . . .[A]n accountant may owe a duty of care to third parties with whom he is not in privity of contract. However, this duty exists only if the accountant actually knows that a specific third party intends to rely upon his work product and only if the reliance is in connection with a particular transaction or transactions of which the accountant is aware when he prepares the work product.

Thaver, 793 **P.2d** at 791. Because the facts of Thaver met the strictest of the three tests, we declined to adopt one of the more liberal standards at that time.

The jury in this case found that **HKM** was negligent in preparing the project's plans and specifications. Therefore, the negligent act, according to the special jury verdict, occurred before HKM actually knew JES, specifically, would be relying on the negligently prepared plans and specifications. The facts of this case therefore do not meet the test we adopted in Thaver.

However, **HKM** should not escape from liability simply because it did not **actually** know JES would receive the bid, when it knew that some contractor would be relying on its plans and specifications. We conclude that in this case, and in other cases wherein a contractor brings a suit against the project engineer or architect, the approach set forth in § 552 of the Restatement should control. Section 552 of the Restatement provides:

(1) One who, in the course of his business, profession

12

or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it: and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

We adopted this section of the Restatement in State Bank of Townsend v. Maryann's, Inc. (1983), 204 Mont. 21, 664 P.2d 295, where we noted the following language from the comment to the Restatement:

. . .[I]t does not follow that every user of commercial information may hold every maker to a duty of care. Unlike the duty of honesty, the duty of care to be observed in supplying information for use in commercial transactions implies an undertaking to observe a relative standard, which may be defined only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect. A user of commercial information cannot reasonably expect its maker to have undertaken to satisfy this obligation unless the terms of the obligation were known to him. Rather, one who relies upon information in connection with a commercial transaction may reasonably expect to hold the maker to a duty of care only in circumstances in which the maker was manifestly aware of the use to which the information was to be put and intended to supply it for

13

**that purpose. . .**

State Bank of Townsend, 664 **P.2d** at 302.

In addition, in discussing Subsection **(2),** the comments to the Restatement note that it is not necessary that the maker of the negligent misrepresentation have any particular person in mind as the intended, or even the probable, recipient of the information.

> . . .[I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who **might** reasonably be expected sooner or later to have access to the information and foreseeably to take some action in reliance upon it.

We find illustration 9, of the comments to Subsection (2) to be particularly applicable:

> The City of A is about to ask for bids for work on a sewer tunnel. It hires B Company, a firm of engineers, to make boring tests and provide a report showing the rock and soil conditions to be encountered. It notifies B Company that the report will be make available to bidders as a basis for their bids and that it is expected to be used by the successful bidder in doing the work. Without knowing the identity of any of the contractors bidding on the work, B Company negligently prepares and delivers to the City an inaccurate report, containing false and misleading information. On the basis of the report C makes a successful bid, and also on the basis of the report D, a subcontractor, contracts with C to do a part of the work. By reason of the inaccuracy of the report, C and D suffer pecuniary loss in performing their contracts. B Company is subject to liability to B and to D.

Thus, we hold that a third party contractor may successfully recover for purely economic loss against a project engineer or architect when the design professional knew or should have foreseen that the particular plaintiff or an identifiable class of

14

plaintiffs were at risk in relying on the information supplied.

## II.  HEARSAY  EVIDENCE

> Did the District Court err by refusing to admit evidence
> that J-M's pipe representative, Vince Pacifico, informed
> JES at the beginning of the construction project that J-
> M's 24-inch PVC pipe could not be deflected?

At trial, HKM offered the deposition testimony of Rex Mishler, a J-M sales representative, and a letter allegedly written by Mishler.  According to HKM, the deposition testimony and the letter would prove that Vince Pacifico, a J-Mtechnical representative who was deceased at the time of trial, informed JES at the project start-up that the 24-inch pipe could not be deflected.  HKM alleges that the District Court erred when it refused to admit the deposition testimony and the letter.  In reviewing the alleged error, we begin with the principle that questions of admissibility of evidence are left to the sound discretion of the trial court, and are subject to review only in the case of manifest abuse. Mason v. Ditzel (1992), 255 Mont. 364, 370-71, 842 P.2d 707, 712.

The District Court excluded Rex Mishler's deposition testimony as hearsay.  On appeal, HKM sets forth two arguments to support its position that the deposition testimony was not hearsay. First, HKM contends that the deposition testimony was not offered to prove the truth of the statements, but to show that JES had notice of the pipe's non-deflectability.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c),

15

M.R.Evid. If a statement is not offered to prove the truth of its contents, but to show whether the statement was made, the statement is not hearsay under the definition. Commissioner's Comments to Rule 801(c), M.R.Evid. HKM contends the deposition testimony was not offered to prove the truth of what was said, that the pipe could not be deflected, but to prove that JES had notice of the pipe's non-deflectability before April 1986.

HKM relies on Moats Trucking Co. v. Gallatin Dairies (1988), 231 Mont. 474, 753 P.2d 883, to support its position that the statements should have been admitted not to prove they were true, but to demonstrate the effect they had on the listener, JES. However, the hearsay statement in Moats is distinguishable from Mishler's hearsay statement. In Moats, the district court allowed a witness to testify about a conversation his employee had with the plaintiff. The district court permitted the testimony to show the resulting effect the conversation had on the witness. Here, HKM attempted to have Mishler testify to a conversation Vince Pacifico had with JES to prove the effect the conversation should have had on JES, not Mishler.

In addition, while HKM argues to the contrary, we conclude that the content of Pacifico's conversation with JES cannot be separated from the fact that he had the conversation, i.e, his siving of the "notice". Without knowing what Pacifico said to JES about deflectability, the mere fact that he had the conversation is meaningless. The offered testimony is probative only if the jury is told that JES was advised by Pacifico that the pipe could not be

16

deflected. Accordingly, it is clear that Mishler's statements about what **Pacifico** said were offered, not simply to show that **Pacifico** made statements to JES about deflectability, but to prove that **Pacifico** said the pipe could not be deflected. Mishler's statements were offered for the truth of the matters asserted and are therefore, hearsay.

Second, HKM claims that the deposition testimony is not hearsay under Rule 801(d)(l)(A), M.R.Evid, because it is a prior inconsistent statement. After reviewing both Mishler's deposition and trial testimony, we conclude that, taken as a whole, the two are not clearly inconsistent. For example, at trial when questioned about Vince **Pacifico's** statements concerning the pipe's deflectability Mishler testified as follows:

Q: [by **HKM's** counsel] Do you have a general recollection?

A: [by Mishler] Of what Vince **Pacifico** said on the **jobsite?**

Q: Yes.

A: At start-up?

Q: Yes.

. . .

A: I really don't remember what was said, no.

At his deposition, Mishler essentially said the same thing:

Q: [by counsel] Now, tell me your best recollection of what you presented at that meeting and any questions, answers, whatever.

A: [by Mishler] Vince made the presentation and told them about the pipe and how to put it in.

Q: Explained to them that you couldn't deflect at the

17

joint no matter what, right?

Q: Do you remember it?

A: I'm sure he did.

Q: Do you remember it?

A: Not specifically.

Because the deposition testimony and the trial testimony are not clearly inconsistent, we conclude that the District Court did not manifestly abuse its discretion in refusing to allow HEM to impeach Mishler with his deposition testimony. See, Walsh-Anderson Co. v. Keller (1961), 139 Mont. 210, 220, 362 P.2d 533, 538.

Finally, HEM contends that the District Court erred by refusing to admit a letter allegedly written by Mishler because the court concluded it was hearsay. This contention ignores the District's Court's ruling. The District Court excluded the letter because of lack of foundation, therefore, HKM's hearsay arguments concerning the letter are irrelevant.

HKM's counsel attempted to introduce the letter as a recorded recollection under Rule 803(5), M.R.Evid. That rule allows the admission of:

> A memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made or adopted by the witness when the matter was fresh in the witness' memory and to reflect that knowledge correctly. . .

Marron v. Great Northern Ry. Co. (1913), 46 Mont. 593, 129 P. 1055, is the leading case outlining the foundational requirements for a recorded recollection:

> (a) The entries must have been written by the witness himself, or under his direction: (b) they must have been written at the time the facts occurred, or at a time when

18

the facts were fresh in the witness' memory: and (c) the witness must have known at the time the entries were made that they correctly stated the facts.

Marron, 129 P. at 1057.

Mishler's testimony revealed that he wrote a draft of the letter and sent it to his employer for approval. Mishler also testified that changes were made to the letter but he could not identify which portions were changed or who actually authored the changes. Mishler also could not remember if the changes would have been in accord with his memory at the time of the writing. Finally, the letter was dated January 8, 1988, over two years after the project start-up meeting would have occurred.

In light of these facts, it is clear that the letter does not meet the foundational requirements for recorded recollection, as the letter was not written when the facts were fresh in Mishler's memory, because all of the entries were not made by him or under his direction, and because Mishler could not state that the entries accurately reflected his memory. We therefore conclude that the District Court did not err when it refused to admit the letter due to lack of foundation.

### III.   EXPERT   TESTIMONY

Did the District Court err by permitting JES's damage expert to give his opinion concerning the damages JES incurred where the expert relied upon business records and long-accepted methodology?

During trial, JES called Bruce Knudsen as an expert witness to express his opinion concerning JES's extra work and delay damages. HKM alleges it was error to permit Knudsen to express his opinion because of lack of foundation, his opinion being based in part on

19

data supplied to him by **JES's** counsel.

The test for admissibility of expert testimony is whether the matter is sufficiently beyond common experience that the opinion of the expert will assist the trier of fact to understand the evidence or to determine a fact in issue. Rule 702, M.R.Evid; Wagner v. Cutler **(1988),** 232 Mont. 332, 339, 757 **P.2d** 779, 783. It is within the discretion of the trial court to determine if an expert is qualified to testify, and absent an abuse of discretion, the court's determination will not be disturbed on appeal. State v. Evans **(1991),** 247 Mont. 218, 228-29, 806 **P.2d** 512, 519.

HKM alleges Knudsen's expert testimony lacked foundation because the records and testimony Knudsen relied upon were not of a type reasonably relied upon by experts in that field. Under Rule 703, M.R.Evid, an expert may base his or her opinion on facts or data perceived by or made known to him at or before the hearing. If the facts or data are **"of** a type reasonably relied upon by experts in a particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence." Rule 703, M.R.Evid; Krueger v. General Motors Corp. **(1989),** 240 Mont. 266, 783 **P.2d** 1340.

In addition, according to Rule 705, M.R.Evid., an expert may give his opinion "without prior disclosure of the underlying facts or data, unless the court requires otherwise." It is then a matter for the cross-examiner to determine the underlying facts on which the expert bases his opinion and expose the weaknesses if any of the underlying facts for the consideration of the jury. Wollaston

v. Burlington Northern, Inc. (1980), 188 Mont. 192, 201, 612 P.2d 1277, 1282. In Wollaston, this Court held:

> As long as the cross-examiner is given adequate opportunity to bring forth for the jury's consideration the weaknesses of any assumptions or facts underlying the opinion, the weight to be given the expert's testimony even on the ultimate issue, is now for the jury to determine.

Wollaston, 612 P.2d at 1282.

At trial, Knudsen testified he began his review of the damage claim by examining the final claim prepared in part by JES's counsel and submitted to HKM's counsel. He then verified the information through an independent review of time cards, the field notes of the engineer and the supervisor, and through discussions with the superintendent and JES's office manager to test the reasonableness of the claim. Knudsen testified that this type of verification was a type of information upon which an accountant would rely, and in fact he had done this type of verification work in the past, and that it was reasonable in the instant case. Over HKM's objection that the opinion testimony lacked foundation, the District Court ruled that Knudsen's opinion regarding JES's delay and extra work damages were based upon statistical sampling, which is a type of data which is reasonably relied upon by experts in the accounting field.

In addition, HKM was allowed to fully cross-examine Knudsen, and was able to reveal through cross-examination that Knudsen based his opinion in part upon the final claim which was prepared by JES's counsel. HKM was also given the opportunity to discredit Knudsen's testimony through its own witness, Loring Gurney, HKM's

21

field inspector.  Gurney's testimony concerning delay damages conflicted with Knudsen's testimony.  HKM now asserts that because Gurney's testimony was based on his observations and field notes, it was superior to Knudsen's damage calculation based upon accepted accounting  methodology.

It is the province of the jury, not this Court to determine the credibility and the weight of conflicting evidence.  Silvis Through Silvis v. Hobbs (1992), 251 Mont., 407, 411-12, 824 P.2d 1013, 1015-16.  As we concluded in Silvis, "[t]his Court will not retry this case because the jury chose to believe the respondents' evidence over that of the appellants.  It is within the jury's province to adopt testimony presented on behalf of one side at the exclusion of the other."  Silvis, 824 P.2d at 1016.

Given the fact that Knudsen based his expert testimony upon methodology accepted in the accounting field, and that HKM was allowed adequate opportunity to cross-examine Knudsen, or otherwise expose any weaknesses in his opinion, we hold that the District Court did not err in allowing Knudsen's testimony.

## IV.   INCONSISTENT   VERDICT

Did the District Court err by denying HKM's motion for a judgment notwithstanding the verdict (JNOV) or in the alternative a motion for a new trial?

Subsequent to trial, HKM moved for a judgment notwithstanding the verdict, or in the alternative a motion for a new trial.  The District Court denied both motions.  On appeal, HKM contends that the District Court erred by failing to grant HKM a new trial. HKM did not raise any arguments concerning the District Court's denial

22

of its motion JNOV, therefore, we will limit our discussion to the argument raised on appeal. HKM alleges it is entitled to a new trial pursuant to § 25-11-102(6), MCA, which provides that a new trial may be granted if the verdict is against the law. HKM contends that the jury verdict violated the law because it was totally inconsistent. HKM claims that the jury verdict was inconsistent because the verdict found that JES and/or its agent, Northwest Pipe, was negligent, but that JES's negligence was not a cause-in-fact of JES's damages. HKM maintains that the only negligence asserted against JES at trial was JES's selection of pipe that it knew or should have known was non-deflectable. JES's damage claim was for extra work and delay damages caused by the use of the non-deflectable pipe. Therefore, according to HKM, JES's negligence had to contribute to its damages. While HKM acknowledges that negligence without causation is possible, HKM claims that JES's negligence did cause JES's delay damages. See, DeVerniero v. Eby (1972), 159 Mont. 146, 496 P.2d 290.

The decision to grant or deny a new trial is within the sound discretion of the trial judge and will not be disturbed absent a showing of manifest abuse of that discretion. Nelson v. Flathead Valley Transit (1992), 251 Mont. 269, 274, 824 P.2d 263, 266. HKM relies on Rudeck v. Wright (1985), 218 Mont. 41, 709 P.2d 621, in support of its argument that a new trial may be granted when a jury's verdict is so totally inconsistent that it is contrary to the mandates of the law. While Rudeck is a correct statement of the law, the facts of that case do not support HKM's position.

23

Rudeck involved a medical malpractice action where the surgeon failed to remove a piece of surgical gauze placed in Mr. Rudeck during surgery. Rudeck, 709 P.2d at 623. During the months after surgery, Mr. Rudeck's physical condition deteriorated, and he eventually died from complications resulting from having the gauze inside his body. Rudeck, 709 P.2d at 623. After his death, Rudeck's wife initiated a wrongful death action and a survival action against the surgeon. Rudeck, 709 P.2d at 623. The jury awarded damages on the wrongful death claim, but did not award damages on the survival claim. This Court concluded that the verdict was totally inconsistent because the same negligence that caused Rudeck's personal injury also caused his death. Therefore, we held that the jury should have been compelled to award damages for both the survival action (arising out of the personal injury claim) and the wrongful death claim. Rudeck, 709 P.2d at 624. In sum, we found that the same negligence of the same defendant was the basis for both the wrongful death action and the survival action. Rudeck, 709 P.2d at 625.

The facts of the instant case are clearly distinguishable from the facts of Rudeck. Here the jury found negligence on the part of both the defendant, HKM and the plaintiff JES. JES's and HKM's negligence did not arise out of one event. HKM had a duty to determine whether the design for the Cerise Road would accommodate the characteristics of the 24-inch PVC pipe. HKM also had a duty when reviewing JES's submittal to determine whether the pipe satisfied HKM's design plans and specifications. The jury found

24

that HKM failed to meet these duties, which is entirely separate from the negligence on the part of JES, in submitting a bid and shop drawings using the non-deflectable pipe.

This Court's function in reviewing a jury's verdict is limited. We review the evidence in a light most favorable to the prevailing party to determine whether substantial evidence supports the jury's verdict, and we cannot reweigh the evidence or disturb the jury's findings unless the evidence is so inherently impossible or improbable as not to be entitled to belief. Sizemore v. Montana Power Co. (1990), 246 Mont. 37, 48, 803 P.2d 629, 636. (Citations omitted). We will not speculate on how the jury viewed the evidence or how it reached its decision. Suffice it to say that there was substantial evidence from which the jury could have concluded that JES's damages were not so much caused by its choice of pipe as by HKM's failure to adequately prepare the plans and specifications for the project.

We therefore conclude that the jury verdict was not inconsistent when it found that JES's negligence was not the cause-in-fact of its damages, and that the District Court did not abuse its discretion in denying HKM's motion for a new trial.

## V. PRO TANTO REDUCTION

Did the District Court err by failing to reduce the jury award against HKM by the amount JES received from settling with LWUA, J-M, and Northwest Pipe?

The jury awarded JES $381,000.00 for damages JES incurred as a result of HKM's negligence in preparing the plans and specifications for the water transmission project. HKM alleges

25

that the $381,000.00 damage award should be reduced by $270,000.00, to reflect the amount JES received in settlement from LWA, and jointly from J-M and Northwest Pipe.

Prior to trial, JES entered into a settlement agreement with LWA wherein LWA agreed to pay JES $75,000.00 as final payment for work JES performed on the contract. LWA also agreed to release the $60,000.00 retainage which had been withheld under the contract to ensure performance by JES. JES and LWA also stipulated to dismiss with prejudice all claims JES had asserted against LWA and all counterclaims LWA had asserted against JES.

JES also entered into a settlement agreement with J-M and Northwest Pipe wherein J-M and Northwest Pipe paid JES $135,000.00 in satisfaction of the claim that J-M and Northwest Pipe had supplied JES with defective pipe. In both agreements, JES specifically reserved the right to pursue its claims for damages against HKM.

Subsequent to trial, HKM moved the trial court to reduce the $381,000.00 jury award by $270,000.00, the amount JES received from the settlement agreements. The District Court denied the motion, concluding that JES sustained injuries which were separate and distinct, resulting from certain independent acts of HKM, LWA, J-M and Northwest Pipe. HKM argues the District Court erred in concluding that this was not a case where one injury was sustained as a result of the concurrent negligence of HKM and the settling parties.

HKM contends that because JES asserted claims against the

26

settling parties **for** which it sought delay damages and lost profits and because JES sought the same damages from HKM at trial, the injuries suffered by JES were not divisible, and HKM is entitled to an offset.  **HKM** further alleges that JES was able to avoid a pro **tanto** reduction by crafting its settlement agreements to reflect that it received compensation for claims which were distinct from the claims it asserted against **HKM** at trial.

The principle of pro **tanto** reduction provides that **"when** a joint tort-feasor settles with a claimant, the claimant's recovery against the remaining tort-feasor is to be reduced **dollar-for-**dollar by the consideration paid by the settling tort-feasor." **Boyken** v. Steele **(1993),** 256 Mont. 419, 421, 847 **P.2d** 282, 284. (Citations omitted).  The pro **tanto** rule applies only if two or more concurrent or joint tort-feasors cause a single "indivisible" harm.  Azure v. City of Billings **(1979),** 182 Mont. 234, 248, 596 **P.2d** 460, 468.

In Azure, we distinguished between situations where damages should be divided between two or more parties because each is responsible for a portion of the injuries inflicted and the consequent damages, and joint and several liability.  We concluded that a pro **tanto** deduction is not allowed where the plaintiff's injuries are divisible.

> If liability is joint and several the plaintiff is
> entitled to only one recovery.  In that event deduction
> of an amount already paid by a joint tortfeasor is
> proper.  But if apportionment of damages applies, each
> defendant must pay his contribution to the whole, and
> therefore a deduction is not allowed for what another
> tortfeasor has paid.

27

Azusa 596 P.2d at 468. (Citations omitted).

We hold that the District Court was correct in finding that HKM was not entitled to a pro **tanto** reduction because **JES** sustained separate and distinct injuries as a result of independent acts of HKM, J-M, and Northwest Pipe.

During trial, both parties introduced evidence, without objection, of the previous settlements and their amounts. The District Court also held a hearing on the motion for pro **tanto** reduction. The evidence presented at trial and the hearing disclosed that the $270,000.00 JES received from LWUA was comprised of $60,000 as payment for a percentage of progress payments which had been withheld as retainage pursuant to the contract, and $75,000.00 for work JES had performed under the contract for which it had not received payment.

The money JES received from J-M and Northwest Pipe was payment for **JES's** claim against them for supplying JES with pipe which was out of round. As a result of the pipe being out of round, JES incurred extra expenses as it had to repair leaks caused by the defective pipe. These damages were distinct and separate from the extra work and delay damages awarded to JES as a result of **HKM's** negligence in preparing the plans and specifications for the project. Because the damages JES sustained as a result of **HKM's** negligence were separate and divisible from the compensation it received from the settling defendants, we hold the District Court did not err in denying **HKM's** motion for a pro **tanto** reduction.

VI. PREJUDGMENT INTEREST

28

Did the District Court err in denying JES's motion for prejudgment interest?

Subsequent to trial, JES moved the District Court for an award of prejudgment interest. After considering the briefs and arguments of counsel the District Court denied the motion. JES argues that it is entitled to prejudgment interest according to the provisions of § 27-1-210, MCA, which allows the payment of prejudgment interest on certain tort claims. Section 27-1-210, MCA, provides:

> Interest on torts. (1) Subject to subsection (2), in an action for recovery on an injury as defined in 27-1-106, a prevailing claimant is entitled to interest at a rate of 10% on any claim for damages awarded that are capable of being made certain by calculation, beginning from the date 30 days after the claimant presented a written statement to the opposing party or his agent stating the claim and how the specific sum was calculated.

According to the statute, prejudgment interest is only allowed for claims which are "capable of being made certain by calculation." Although this Court has not ruled on that portion of the statute, the same language is found in § 27-1-211, MCA. In construing the meaning of the same language found in that statute, this Court has found that when a claimant alleges an award which is substantially different from the amount ultimately awarded by the trial court, the damages are not capable of being made certain by calculation. See, Maddux v. Bunch (1990), 241 Mont. 61, 67, 784 P.2d 936, 940; Northwestern Nat. Bankv. Weaver-Maxwell (1986), 224 Mont. 33, 43-44, 729 P.2d 1258, 1264; Swenson v. Buffalo Bldg. Co. (1981), 194 Mont. 141, 153, 635 P.2d 978, 985. For example, in Maddux, the plaintiff claimed the loss of the value of a gravy

29

product in the amount of $35,614.08. Because the jury awarded the plaintiff $23,378.95, this Court found that the amount of damages due upon breach was not clearly ascertainable until determined by the trial court. We therefore concluded that prejudgment interest was not appropriate. Maddux, 784 P.2d at 940.

In the instant case, JES did not offer any evidence prior to trial regarding how the specific sum of delay and extra work damages at the Cerise Road "S" curve would be calculated. At trial JES's damages expert calculated the damages to be $510,899.00. However, the jury only awarded JES $381,000.00. We therefore conclude that JES did not show that the damages it sustained as a result of HEM's negligence in designing the portion of the pipeline along the Cerise Road "S" curve was "capable of being made certain by calculation," and hold that the District Court did not err in denying JES prejudgment interest.

AFFIRMED.

We Concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

_____
Justice

Justice Terry N. Trieweiler specially concurring.

I concur with the result of the majority opinion. However, I specially concur with the majority's resolution of issues numbered 1 and 2.

I agree with the majority's conclusion that the plaintiff was entitled to sue in tort to recover economic damages from the defendant. Based on the facts in this case, I also agree that a duty was proven, pursuant to the stricter standard set forth in the Restatement (Second) of Torts § 552 (1977). However, I would not limit an engineer's duty to exercise reasonable care to that class of people set forth in § 552. Section 27-1-701, MCA, provides that "everyone is responsible not only for the results of his willful acts but also for an injury occasioned to another by his want of ordinary care or skill . . . ." I see no reason to treat engineers differently than anyone else, and therefore, would apply ordinary negligence rules to determine the scope of liability of the defendant in this case. I would conclude that the defendant owed a duty to exercise reasonable care to all who might reasonably and foreseeably obtain and rely upon his or her work product.

I also disagree with the majority's conclusion that Rex Mishler's deposition was hearsay. I believe the testimony was offered to simply prove that Vince Pacifico's statement was made, and that because it was made, the plaintiff had notice that the pipe could not be deflected. Whether or not Pacifico's statement was true was immaterial. However, when considered in the entire context of Mishler's deposition testimony, the statement that

31

defendant sought to offer was equivocal and did not clearly contradict Mishler's trial testimony. Its probative value was questionable, and therefore, I agree that the District Court did not abuse its discretion when it excluded the deposition testimony. Furthermore, even if the District Court had erred by excluding the testimony, it was of no value to the defendant, and therefore, there was no prejudice from its exclusion.

For these reasons, although.1 do not agree with all that is said in the majority opinion, I concur with its result.

_____
Justice

32

July 12, 1994

CERTIFICATE   OF   SERVICE

I hereby certify that the following certified order was sent by United States mail, prepaid, to the following named:


NEIL  G.  WESTESEN  and  DONALD  L.  HARRIS
CROWLEY, HAUGHEY, HANSON, TOOLE & DIETRICH
P.O.  BOX  2529
BILLINGS, MT 59103-2529

STEPHEN  D.  BELL  and  ROBERT  L.  STERUP
DORSEY  &  WHITNEY
P.O.  Box  7188
Billings,   MT   59103-7188

JOHN  F.  SULLIVAN
HUGHES, KELLNER, SULLIVAN & ALKE
P. 0. Box 1166
Helena,   MT   59624-1166


ED  SMITH
CLERK  OF  THE  SUPREME  COURT
STATE  OF  MONTANA

BY:_____
Deputy