No. 97-648

IN THE SUPREME COURT OF THE STATE OF MONTANA

1998 MT 183N

IN RE THE MARRIAGE OF

M. AMY HAUGHTON,

Petitioner, Respondent and Cross-Appellant,

and

FRANK B. HAUGHTON, JR.,

Respondent, Appellant and Cross-Respondent.

APPEAL FROM: District Court of the Thirteenth Judicial District,

In and for the County of Yellowstone,

The Honorable Russell C. Fagg, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Donald L. Harris, Christopher Manger, Jr.; Crowley, Haughey,

Hanson, Toole & Dietrich, Billings, Montana

For Respondent:

Vernon E. Woodward; Hendrickson, Everson, Noennig &

Woodward, Billings, Montana

Submitted on Briefs: June 25, 1998

Decided: July 21, 1998

Filed:

_____

Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

**¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent but shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number, and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.**

¶2 Frank B. Haughton (Frank) appeals from the decision of the Thirteenth Judicial District Court, Yellowstone County, dissolving the marriage between Frank and M. Amy Haughton (Amy), distributing the marital property and awarding child support to Amy. Amy cross-appeals the issue of whether the District Court improperly allowed evidence of marital misconduct. We affirm.

## Statement of the Facts

¶3 Frank and Amy were married in Midland, Texas on December 1, 1984. Two children were born of the marriage, Ellie, born July 10, 1987, and Ben, born September 6, 1989. Throughout the marriage, Frank was self-employed as an independent landman in the oil and gas business. Amy has a finance degree and was employed as a bank officer prior to the birth of their first child. After Ellie's birth, however, Amy was essentially a full-time homemaker and performed office work for Frank's business. At the time of trial, Amy was working part time as an administrative assistant at the Billings Deaconess Health Center, had approximately $10,000 in income from a jewelry business she began in 1994, and received $1,100 per year in rental income from her interest in a family ranch. The District Court found that Amy's ties to Texas and her father's prominence in the oil business opened many doors for Frank. In addition, Amy received a $40,000 inheritance in 1991 which was invested in the oil and gas business.

¶4 The parties were quite frugal with their money. Other than purchasing a Suburban in 1993, the parties made no major purchases during the course of their marriage. All of the parties' money was invested in Frank's oil and gas business in hopes that one day their investments would create a comfortable retirement.

¶5 The couple began experiencing marital problems in approximately 1995 which Frank attributes to Amy's affair with another man. Frank and Amy began marriage counseling in the fall of 1995 with Bob Bakko. Mr. Bakko testified that Amy was sincere in her effort to preserve her marriage. Nevertheless, Frank moved out of the family home in March 1996. A decision to divorce had not at that time been made, and Frank moved back in at the end of April. Amy petitioned for dissolution in May 1996 and moved out in July 1996. During their separation and through the time of trial, Frank and Amy's income was deposited in their joint account and bills were paid out of the joint account.

¶6 Of significance is the fact that, in 1995 and 1996, the parties' investments finally began to pay off. On August 1, 1995, the parties had a total net worth of approximately $275,911, but by January 16, 1997, their total net worth had grown to $479,081. This increase in net worth resulted from two factors: 1) Conoco prepaid Frank and his partners $650,000 for leases and work to be performed in 1997 and 1998; and 2) Frank entered into a contract with JN Oil and Gas involving the Hudson Ranch Project for which he received approximately $300,000 (half paid in July 1996 and half to be paid in March 1997). During the course of the marriage, the parties gross income varied significantly from year to year ranging from $13,212 to $137,632. However, Frank testified that in 1996 he earned $280,000 and in 1997 approximately $320,000.

¶7 Prior to trial, Frank and Amy agreed to a joint custody arrangement which the District Court incorporated into the final decree. The parties requested that the court distribute the marital property. The District Court determined that an equal division of the marital estate was the most equitable division. The parties agreed to the value of most of their assets, with a few notable exceptions. The court determined that, because of the nature of the oil and gas business and the land holdings of the parties, it was in the best interest that Amy not receive specific pieces of property, but rather, that Frank purchase her interest in those assets.

¶8 As to child support, the court determined that Frank should pay child support to Amy based on the Montana Child Support Guidelines. In addition, the court ordered that child support be reviewed in one year to allow the parties a period of time to evaluate their incomes. The court ordered the parties to exchange support calculations based on an average income of over $60,000 for Frank and attempt to agree to the amount of child support. However, the parties were unable to stipulate and the District Court later adopted the $1,589 per month support amount proposed by Amy.

¶9 Frank appeals from the District Court's findings of fact and conclusions of law. We address three issues on appeal:

¶10 1) Did the District Court clearly err in distributing the marital estate?

¶11 2) Did the District Court err in denying Frank's motion to partially allow him to satisfy the amount owing to Amy by transferring oil and gas properties as a

substitute for cash and in denying Frank's related motion for a new trial?

**¶12 3) Did the District Court abuse its discretion in calculating child support?**

Amy presents one issue on cross-appeal: Did the District Court err in allowing Frank to introduce evidence of marital misconduct during the property distribution stage of the hearing?

Discussion

I

**¶13 1) Did the District Court clearly err in distributing the marital estate?**

**¶14 This Court reviews a District Court's findings regarding distribution of a marital estate to determine whether the District Court clearly erred. The clearly erroneous standard involves a three-part test:**

> 1) the Court will review the record to see if the findings are supported by substantial evidence; 2) if the findings are supported by substantial evidence, the Court determines if the trial court has misapprehended the effect of the evidence; and 3) if substantial evidence exists and the effect of the evidence has not been misapprehended, the Court may still find that "a finding is clearly erroneous when, although there is evidence to support it, a review of the record leaves the court with the definite and firm conviction that a mistake has been committed."

Pfeifer v. Pfeifer (1997), 282 Mont. 461, 467, 938 P.2d 684, 688 (citations omitted). Frank asserts that the District Court clearly erred in distributing the marital estate by incorrectly valuing certain oil and gas properties, incorrectly valuing the marital estate at the time of dissolution, treating deferred income as an asset, and failing to deduct the tax liability created by the court's distribution.

**¶15 The most significant error alleged by Frank is that the District Court erred in adopting the values proposed by Amy's expert regarding four properties: the Big Snowy project, the Bowman County property, the Slope County property and the Golden Valley County property. Frank argues that there is no substantial evidence to support the District Court's findings regarding the value of the properties.**

Moreover, Frank asserts that the District Court relied on irrelevant factors in valuing those properties.

¶16 The parties presented extensive expert testimony regarding the value of the properties. For the most part, the experts agreed regarding the value of the holdings of Frank and Amy. The notable differences being to the value of the Big Snowy project and the Bowman, Slope and Golden Valley properties. Frank's expert testified that the four properties were virtually worthless because the cost to maintain those properties exceeded their value. On the other hand, Amy's expert testified that the properties were valuable. Most significantly, Amy's expert explained that the Big Snowy project involved the land deal with Conoco which had already earned a large sum of money and that Conoco was exercising additional options which would further increase the value of the project. In addition, Amy's expert characterized the Bowman property as being in the "heart of the play." He further explained that Bowman is possibly the most active exploration area in the United States and the success ratio for finding oil is high.

¶17 The District Court determined that the values should be equitably set somewhere between the figures presented by opposing experts. The court found it significant that one of Amy's experts was a petroleum engineer, whom the court found was more qualified to value producing properties using the decline curve method. The court further explained that it found Amy's values more credible because she was willing to buy out Frank's interest in the property based on her values. The court found inconsistent the fact that Frank specifically requested that the proceedings be confidential because of the valuable nature of the land deals with Conoco, yet his expert testified that the land involved in the Conoco deal was worthless. As a result, the court adopted the values proposed by Amy's expert, but discounted the values by ten percent. The District Court determined that the equities demanded a value closer to that proposed by Amy. There is substantial credible evidence to support the District Court's valuation of the properties.

¶18 In addition, Frank contends that the District Court erred in valuing the marital estate at the time of trial instead of at the time he contends that the marriage was over. Frank asserts that when Amy began her extramarital affair she effectively ended the marriage. Notably, as a result of the Conoco and Hudson Ranch deals, the parties' financial status changed dramatically during the period of time that Frank and Amy were experiencing marital difficulties. Frank argues that the marital estate

should be valued as of August 1995, prior to the land deals, as opposed to March 1997, the time of trial.

¶19 However, this Court has stated that the proper time for valuing the marital estate cannot always be tied to some specific time or event in the dissolution process and the district court must exercise discretion in determining the proper time. In re Marriage of Lopez (1992), 255 Mont. 238, 244, 841 P.2d 1122, 1125. The District Court in this case found the testimony of the counselor, Mr. Bakko, to be helpful in determining when to value the marital estate. Specifically, the court found that Amy's relationship with another person was not indicative of the end of the marriage. Rather, the court found the fact that the parties continued to try to reconcile and continued to maintain joint accounts more persuasive as to the duration of the marriage. Therefore, the court determined that it was appropriate to follow the general rule and value the marital estate at the time of actual dissolution. See In re Marriage of Walls (1996), 278 Mont. 413, 417, 925 P.2d 483, 485. The District Court did not abuse its discretion in valuing the marital estate at the time of dissolution.

¶20 Frank also alleges that the District Court erred in valuing the marital estate by treating deferred income as an asset and by failing to deduct the tax liability created by the court's distribution. As to Frank's assertion that the court treated deferred income as an asset, Frank alleges that the court erred in treating the Conoco prepayment as an asset for purposes of distributing the marital estate. Frank does not direct this Court to any authority supporting his argument that the court erred in its valuation.

¶21 We determine that § 40-4-202, MCA, gives the District Court broad discretion to consider a number of factors in distributing the marital estate. The District Court considered the fact that no maintenance was being awarded and that Amy had relatively few opportunities for future acquisition of capital assets and income in comparison to Frank. Moreover, the court found that the parties had been developing their interests in oil and gas deals throughout the marriage and are only now reaping significant monetary gain. The court stated that "the fact remains that the Conoco deal and the Hudson Ranch deal were started while the parties were married," therefore the District Court determined that it would be equitable to award Amy a portion of the gain achieved by those deals. The District Court did not abuse its discretion in treating the Conoco prepayment as an asset for purposes of

distributing the marital estate.

¶22 Frank further argues that the District Court erred in failing to deduct tax liabilities from the value of the marital estate. In support of his argument, Frank asserts that he presented testimony by deposition of his accountant which indicated that state and federal taxes on the sale of Frank's oil and gas properties would total $33,000. Frank claims that the District Court's failure to include this tax liability in the value of the estate was an error. Frank cites In re Marriage of Lee (1991), 249 Mont. 516, 816 P.2d 1076, in support of this claim.

¶23 Marriage of Lee, however, stands for the proposition that where a property distribution ordered by the court includes a taxable event "precipitating a concrete and immediate tax liability," such tax liability should be considered by the court in entering its final judgment. Marriage of Lee, 249 Mont. at 519, 816 P.2d at 1078. The District Court in this case did not order Frank to sell his oil and gas properties. In fact, the District Court sought to preserve those properties. The District Court did not order any action by Frank that would include a taxable event. The District Court did not err in failing to deduct tax liabilities from the value of the marital estate.

¶24 In sum, the District Court did not err in adopting the valuations of property proposed by Amy's expert. The District Court did not abuse its discretion in valuing the marital estate as of the time of dissolution. Finally, the District Court did not err in considering the Conoco prepayment an asset for purposes of distributing the marital estate nor in failing to deduct tax liabilities from the value of the marital estate.

II

¶25 2) Did the District Court err in denying Frank's motion to partially allow him to satisfy the amount owing to Amy by transferring oil and gas properties as a substitute for cash and in denying Frank's related motion for a new trial?

¶26 At trial, Frank specifically requested that the oil and gas properties not be divided and he expressed concern that his partners would not want Amy substituted as a partner. As a result, the District Court determined it was best to keep the properties intact and have Frank buy out Amy's interest. After the court accepted Amy's valuations of the property, Frank determined he had insufficient liquid assets

to buy out Amy's interest and moved the court to allow him to satisfy the debt by transferring oil and gas properties. The court denied Frank's request. Frank asserts that the District Court erred in denying his motion to satisfy the equal division to Amy by conveying nonpartnership oil and gas properties in lieu of cash.

¶27 Specifically, the District Court determined that it would be unfair to allow Frank an opportunity to "unload his less desirable properties without input from [Amy] - this unilateral decision is not appropriate." The court left open the option for Amy and Frank to agree to a property settlement, but stated that if they could not agree, Frank must pay cash according to a payment schedule.

¶28 Furthermore, Frank moved the District Court for a new trial in the event the court denied his motion to substitute property for cash. In his motion for a new trial, Frank requested that the District Court reconsider its valuations of the oil and gas properties. The District Court denied Frank's motion for a new trial, explaining that its valuations were supported by the evidence. The decision to grant or deny a new trial is within the sound discretion of the district court and will not be disturbed absent a showing of manifest abuse of discretion. Jim's Excavating Serv., Inc. v. HKM Assoc. (1994), 265 Mont. 494, 512, 878 P.2d 248, 259. The District Court did not abuse its discretion in denying Frank's motions.

III

¶29 3) Did the District Court abuse its discretion in calculating child support?

¶30 Frank contends that the District Court abused its discretion in calculating the amount of child support. The crux of Frank's argument is that the court should have included Amy's distribution from the marital estate as income to her in calculating child support. However, the court specifically found that the $338,000 that Frank owes Amy to equalize the marital distribution is not income to Amy for purposes of calculating support. This Court reviews a district court's award of child support to determine whether the district court abused its discretion. In re Marriage of Craib and Rhodes (1994), 266 Mont. 483, 490, 880 P.2d 1379, 1384.

¶31 The court instructed the parties to exchange child support calculations based upon the Montana Child Support Guidelines. The District Court noted that if the parties were unable to stipulate to a child support amount, the court would

determine a child support amount based upon the proposed calculations submitted by the parties. Additionally, the court determined that child support should be reviewed in one year after the parties have more evidence of their incomes.

¶32 The parties each submitted calculations based on the Montana Child Support Guidelines. Since the results of the calculations were dramatically different, Frank and Amy were unable to stipulate to an amount. As a result, Frank and Amy submitted the calculations to the District Court for an order regarding the amount of child support. The court adopted the calculation submitted by Amy's expert because Frank's expert had attributed Amy's portion of the marital estate to her as income. In fact, Frank's proposed calculations indicated that Amy would receive income exceeding $100,000 for the term of Frank's payments. As a result, Frank's calculations indicated that Amy should pay Frank $81 per month in child support. On the other hand, Amy's calculations were based on an income of $296,144 for Frank which was an average of his 1996 and 1997 incomes. Amy's calculations resulted in a monthly obligation of $1,589.

¶33 Frank argues that the child support calculations submitted by Amy are not accurate because the amounts of the Conoco and Hudson Ranch project, which were considered by the court in valuing the marital estate, were attributed to him as income for purposes of calculating child support, but considered an asset for purposes of distribution to Amy.

¶34 In adopting Amy's calculations, the District Court relied on this Court's decision in In re Marriage of Widhalm (1996), 279 Mont. 97, 926 P.2d 748. In Marriage of Widhalm, the wife was awarded $70,000 for her interest in the ranch to be paid over a period of years. The husband argued that the amount paid to the wife should be attributed to her as income for purposes of calculating child support. This Court held that her portion of the marital estate, even though it is paid over a period of time, does not create some new or greater obligation on her part to the children, nor does it serve to convert her share of the marital property into newly acquired income. Marriage of Widhalm, 279 Mont. at 103, 926 P.2d at 752.

¶35 The District Court noted that the calculations proposed by Amy were based on incomes figures that were supported by the court's findings. The court further noted that the income figures used by Frank were incorrect. While the District Court acknowledged that the child support award was "a lot of money," the court also

acknowledged that "Frank earns a lot of money." Specifically, the District Court noted that Frank testified that his income in 1996 was approximately $280,000 and in 1997 was approximately $320,000. The District Court said it was giving Frank the benefit of the doubt by averaging his income rather than just considering his income for 1997. Moreover, in recognition of the variable rate of Frank's income, the District Court required that child support be reviewed in one year. Section 40-4-204, MCA, provides that the amount of child support determined "under the guidelines is presumed to be an adequate and reasonable support award, unless the court finds by clear and convincing evidence that the application of the standards and guidelines is unjust to the child or to any of the parties or that it is inappropriate in that particular case." We determine that the child support award in this case is reasonable and just to the children and the parties. The District Court did not abuse its discretion in calculating child support.

IV

¶36 4) Did the District Court err in allowing Frank to introduce evidence of marital misconduct during the property distribution stage of the hearing?

¶37 Amy alleges, in her cross-appeal, that the District Court improperly allowed Frank to introduce evidence of marital misconduct during the property distribution stage of the hearing. Amy, however, does not assert that the court erred in distributing the marital estate or that the court valued the estate at an improper time. Rather, Amy seeks a directive from this Court to the District Court that it should not, in the future, allow evidence of marital misconduct. Amy asserts that Montana adopted the Uniform Marriage and Divorce Act because it eliminated the concept of fault in dissolutions. In essence, Amy asserts that the District Court erred in allowing Frank to make the argument that the marital estate should be valued at the time she allegedly began an extramarital affair. While we agree that the District Court should not consider marital misconduct in equitably apportioning the marital estate, we see no err in the court's ultimate distribution, nor has Amy alleged such an error. Affirmed.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ KARLA M. GRAY