No.  96-149

IN THE SUPREME COURT OF THE STATE OF MONTANA

1997

JAMES HOUDASHELT, LINDA HOUDASHELT,
and MTM, INC., a Montana Corporation,

Plaintiffs, Respondents, and
Cross-Appellants,

v.

DAVID B. LUTES,

Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin,
The Honorable Larry W. Moran, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Mark A. Bryan, Bozeman, Montana

For Respondent:

Richard A. Ramler, Belgrade, Montana; Terry F. Schaplow, Bozeman,
Montana

Submitted on Briefs: March 6, 1997

Decided:    May 15, 1997
Filed:

_____
Clerk

Justice William E. Hunt, Sr., delivered the Opinion of the Court.

Appellant David B. Lutes (Lutes) contracted to buy and Respondents James and
Linda Houdashelt (the Houdashelts) contracted to sell the Houdashelts' engine rebuilding
business (Jim's Diesel).  The Houdashelts later filed suit in the Eighteenth Judicial
District Court, Gallatin County, claiming that Lutes had defaulted in his payments and

alleging fraud, negligent misrepresentation, breach of contract, unlawful detainer, and conversion. Lutes filed a counterclaim, alleging rescission of the contract. After a bench trial, the District Court found that Lutes had materially breached and defaulted upon the contract. It therefore returned the business to the Houdashelts and awarded them damages consequent to Lutesþ default and misuse of the business. It also concluded that Lutes was not entitled to rescission of the contract. Lutes appeals.

Affirmed.

## ISSUES

The Houdasheltsþ cross-appeal presents certain arguments as an "alternate basis" for the District Courtþs award of damages, should this Court determine that the District Court erred in its reasoning. Since we determine that the decision and award of the District Court were not erroneous, we need not address the cross-appeal.

Lutes presents the following restated issues on appeal:

1. Were the District Courtþs findings regarding the water-waste disposal system at Jimþs Diesel clearly erroneous?

2. Did the District Court err in concluding that Lutes was not entitled to rescind the contract?

3. Did the District Court abuse its discretion in awarding damages to the Houdashelts under the contract?

## FACTS

The Houdashelts were the owners and operators of Jimþs Diesel, an engine rebuilding business in Belgrade, Montana. Jim Houdashelt ran the business and his wife, Linda, kept the books.

In greatly simplified terms, the process used by Jimþs Diesel to rebuild an engine involved two steps, cleaning and repair. Most of the engine parts were cleaned by a high-pressure water sprayer; some were cleaned in chemical baths and then sprayed off. The run-off from the water sprayer flowed into a "sump" which held approximately 90 gallons of water. The sump was outfitted with a "T" pipe which was in turn connected to a discharge pipe. The "T" prevented the upper level of water from draining directly into the discharge pipe, thereby keeping oil out of the system (because the oil collected on the surface of the water). Heavier particles settled into a sludge at the bottom of the sump, and the water drained out the discharge pipe. The Houdashelts periodically cleaned the sludge out of the sump, drying it in the sun on sheets of plywood and then disposing of it in the dumpster. The Houdashelts were careful to clean out the sump whenever 2 « inches of sludge accumulated, because 3 inches of sludge would plug up the discharge pipe. While operating Jimþs Diesel, the Houdashelts worked almost exclusively on engines that had elsewhere been drained of oil and anti-freeze so that they did not have to dispose of large amounts of those fluids.

The sump system at Jimþs Diesel was initially installed in 1979 or 1980 and designed to drain into a perforated underground pipe (the "leach line"). In 1983, when problems developed with the leach line, the Houdashelts reconnected the sump to drain through a solid pipe into a separate drainage area known as "Pit 1."

In 1988, the Houdashelts considered selling Jimþs Diesel and retiring. Lutes, a real estate broker and engineer, became interested in the business and began visiting the shop. After he decided to buy the business, the Houdashelts and Lutes began negotiating the terms of the sale. The Houdashelts agreed to accept a down payment of $50,000 and periodic payments on the balance, as well as to hold the note themselves. They further agreed to rent the business premises to Lutes on a monthly basis, the real estate not having been included in the sale of the business. The Houdashelts were adamant, however, that the down payment not consist of borrowed money, because the additional debt would make it difficult to operate the business profitably. Unbeknownst to them, Lutes borrowed the entire down payment. The sale was completed in January of 1989.

In accordance with the sale agreement, the Houdashelts remained at Jimþs Diesel for 90 days to assist Lutes in running the business. Jim Houdashelt trained Lutes in customer service and office work, while Linda Houdashelt continued to serve as the business bookkeeper. All the parties were aware that Lutes knew very little about the actual process of engine rebuilding, but no one seemed to believe that would prevent him from running the business successfully. The actual engine rebuilding was done by

employees, all of whom agreed to stay on after the sale.  After the 90-day training period, the Houdashelts left the business in Lutesþ hands.

By August of 1989, Lutes had been running the business for approximately eight months.  At that time, the Houdashelts, as the owners of the real property used by Jimþs Diesel, decided to stop allowing Jimþs Diesel to drain its sump into Pit 1.  Instead, they installed a new solid-pipe line to drain the sump into another location, Pit 2.  The Houdashelts discontinued the use of Pit 1 and instituted the use of Pit 2 in anticipation that the tenants of another building they owned nearby would also use sump systems.  For various reasons, however, no other sump systems were ever hooked up.  Therefore, Pit 2 was used solely by Jimþs Diesel and only during the time the business was operated by Lutes.

By the end of 1989, Lutes was behind in his payments to the Houdashelts.  His situation did not improve through 1990, and, consequently, the parties met to restructure the sale.  On September 28, 1990, the Houdashelts and Lutes signed an addendum to the contract for sale specifying how Lutes would make up the delinquent payments.  At the time the addendum was signed, Lutes had been operating the business for approximately twenty-one months.

In April 1991, a neighboring land owner reported to the Montana Department of Health and Environmental Sciences (the State) and to Lutes the existence of a large pool of pollutants near his property line in the area of Pit 2.  Upon investigation, the neighbor discovered overflowing 55-gallon drums of sludge with their contents pouring out on to the ground.  He also found areas where wheelbarrows full of sludge had been dumped on the ground.  He discovered an old pickup bed resting on the ground, full of sludge and leaking, as well as empty containers of chlorinated solvents.

On May 2, 1991, the State conducted an inspection of the Jimþs Diesel premises.  It ordered the sump system, which was by then essentially non-functioning, to be capped off to prevent its further use.  The capping of the sump on May 15, 1991, effectively shut down the business.  Testing of the soil around Jimþs Diesel revealed that the vast majority of pollutants were concentrated in Pit 2, the discharge area used while Lutes ran the business.  The leach line, which had not been used for over seven years, contained trace amounts of one or two pollutants, but not enough to warrant cleanup.  The Pit 1 area was free of pollutants.

Also by the spring of 1991, Lutes was again delinquent on his payments and in default of the contract.  The Houdashelts sent him a notice of acceleration of the contract and a notice of termination of the lease.  On May 15, 1991, Lutes tendered a notice of rescission of the contract, which the Houdashelts refused.  On May 24, 1991, Lutes vacated the premises and the Houdashelts repossessed the business.

Upon repossession, the Houdashelts discovered that the cap on the "T" in the sump had been removed, thereby allowing oil and grease to flow directly into the discharge pipe.  They also found the sump to be virtually full of sludge, causing the sump itself to overflow.  In addition, they discovered that the shop and grounds were a mess; the inventory had been greatly depleted; and the machinery  was dirty and in need of servicing.  The Houdashelts then filed suit, claiming that Lutes had defaulted in his payments, alleging breach of contract, and asking for repair damages and clean-up costs.  Lutes counter-sued for rescission of the contract, asserting that the sump system was an illegal waste-disposal system; that it had never worked in compliance with the applicable state and federal laws; and that the Houdashelts had misrepresented the business and its profit potential.

After a seven day bench trial, the District Court concluded that Lutes had defaulted on the contract by failing to make the payments due.  It found Lutes to be responsible for the cost of cleaning and repairing the business and grounds, and awarded the Houdashelts the loss sustained on the business contract, past-due rents,  damages, and attorney fees and costs.  Lutes was awarded nothing on his counter-claim.

STANDARD OF REVIEW

This Court reviews a district court's findings of fact to determine whether they are clearly erroneous, giving due regard to the opportunity of the trial court to judge of the credibility of the witnesses.  Rule 52(a), M.R.Civ.P.; Rafanelli v. Dale (1996), 924 P.2d

242, 245, 53 St.Rep. 746, 748. In determining whether a court's findings of fact are clearly erroneous, we first review the record to see if the findings are supported by substantial evidence. If the findings are supported by substantial evidence, we determine if the trial court has misapprehended the effect of evidence. If substantial evidence exists and the effect of the evidence has not been misapprehended, this Court may nevertheless determine that a finding is clearly erroneous if "although there is evidence to support it, a review of the record leaves the [C]ourt with the definite and firm conviction that a mistake has been committed." Rafanelli, 924 P.2d at 245 (citing Interstate Prod. Credit Ass'n v. DeSaye (1991), 250 Mont. 320, 323, 820 P.2d 1285, 1287). Our standard of review relating to conclusions of law is whether the trial judge's interpretation of the law is correct. Jimþs Excavating Service, Inc. v. HKM Associates (1994), 265 Mont. 494, 501, 878 P.2d 248, 252 (citing Steer, Inc. v. Department of Revenue (1990), 245 Mont. 470, 474-75, 803 P.2d 601, 603).

## DISCUSSION

1. Were the District Courtþs findings regarding the water-waste disposal system at Jimþs Diesel clearly erroneous?

Lutes takes issue with several of the District Courtþs findings of fact regarding the sump system. In particular, the District Court found that the Houdashelts had acquired the necessary permit before constructing the sump system; that the sump was in compliance with environmental regulations while the Houdashelts operated it; and that the sump worked properly until Lutesþ misuse effectively broke it, causing in turn the subsequent pollution. In attacking these findings, Lutes cites the testimony of his expert as well as his own testimony in support of his contention that the sump system was not permitted and was, therefore, illegal since its installation. He also notes that his expert found contaminants in the leach line, which was used years before Lutes assumed the business. This, Lutes contends, proves that the sump system was pollutive and never worked correctly.

### a. The sump system permit.

Lutes devotes considerable attention to his argument that the sump system did not have a proper permit and was, therefore, illegal. While admitting that the Houdashelts had obtained a general septic permit from the county when installing the system, Lutes claims that such a permit was not sufficient for industrial discharge. He argues that the District Courtþs finding to the contrary is clearly erroneous. In response, the Houdashelts assert that the question of whether the sump system had the proper permit is largely beside the point. We agree.

We have stated that "[r]elevant evidence is evidence having any tendency to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence." Peschke v. Carroll College (1996), 929 P.2d 874, 881, 53 St.Rep. 1428, 1433 (citing Rule 61, M.R.Civ.P.; Hansen v. Hansen (1992), 254 Mont. 152, 835 P.2d 748). We have also held that "[f]or error to be the basis for a new trial, it must be so significant as to materially affect the substantial rights of the complaining party." Zekeþs Distributing Co. v. Brown-Forman Corp. (1989), 239 Mont. 272, 278, 779 P.2d 908, 912 (citing Rule 61, M.R.Civ.P.; Giles v. Flint Valley Forest Products (1979), 179 Mont. 382, 588 P.2d 535). Common sense dictates that if an error is made in a finding of fact which only addresses some minor point largely irrelevant to the disposition of the case, that error cannot materially affect the substantial rights of the complaining party. It will not, therefore, be the basis for reversal of the district courtþs decision.

In this case, the Houdashelts asserted that Lutes had breached and defaulted on the contract for sale. They further asserted that Lutes was responsible for damages consequent to his misuse and damage of the sump system, including the pollution damage which the Houdashelts claimed occurred once the sump system ceased to function. In denying their claims, Lutes argued that the Houdashelts should be held responsible for the pollution damage because the sump system had never worked correctly. Given these issues, the District Court properly concerned itself with the questions of whether the sump had in fact worked correctly and, if so, when it ceased to function, and why. The establishment of the existence or nonexistence of a permit for the sump does not serve to answer any of these questions. Provided the sump worked correctly (as the District

Court found it did), the absence of a permit would not make the Houdashelts responsible for the damages caused by Lutesþ misuse of the system. Therefore, we need not determine whether the District Courtþs finding of fact regarding the sump permit was erroneous; even if it were, such error would be harmless.

b. State and Federal regulations.

Similarly, Lutes argues that the District Court erred in concluding that the sump system complied with all the relevant State and Federal environmental regulations. In making this argument, Lutes does not assert any specific violations of any particular regulation in order to prove that the Houdashelts were responsible for the pollution at Jimþs Diesel. Rather, he contends that the environmental regulations in effect at the time indicate that a specific permit (other than a general septic permit) was required to operate a sump system such as the one in use at Jimþs Diesel. Since the Houdashelts did not have the proper permit, Lutes argues, they were automatically in violation of the regulations which required one. Lutes argues that the District Court erred in finding to the contrary.

We decline to address the specifics of this allegation of error for the same reasons given in subsection "a," above. Even if the sump violated some un-named governmental regulation by failing to have the proper permit, such violation would not excuse Lutesþ damage of the business by misusing the sump system and causing the subsequent pollution problem. The permit issue is largely irrelevant, as the District Court itself noted when determining it was "much ado about nothing." The findings and conclusions regarding the permit, even if erroneous, are harmless and would not serve as a basis for a new trial. This Court therefore need not review them.

c. The environmental contamination.

While the District Court properly determined that the permit issue was largely beside the point, the issues of the extent of and responsibility for the pollution at Jimþs Diesel were central to the resolution of this case. Lutes disputed the District Courtþs finding that he alone was responsible for the malfunction of the sump system and the consequent pollution, as well as the courtþs finding that the sump system had worked properly and without contamination throughout the time the Houdashelts owned the business.

In disputing these findings, Lutes points out that his expert discovered trace amounts of a single contaminant in the abandoned leach line, which the Houdashelts had used to empty the sump until 1983. He argues that this testimony indicated that the sump system was pollutive long before he took over the business and that the pollution clean up, therefore, should be the responsibility of the Houdashelts.

The Houdashelts, however, presented testimony from an expert whom they hired to determine the extent and location of the contamination. Their expert testified that the only significantly contaminated area, and the only area requiring environmental cleanup, was Pit 2, which was used solely by Lutes. The Houdasheltsþ expert further testified that the tests performed indicated that the leach line area required no remediation. In addition, the Houdashelts argued that the leach line could not possibly be a source of the extensive and recent contamination because it had not been used in over eight years. In identifying the source of the pollutants, the Houdasheltsþ expert testified:

[I]t was apparent that the waste produced by the engine rebuilding process used at the shop generated little or no hazardous wastes and the illegal discharge of waste material into the floor drain was the cause of the contamination of the sump area. [I]f the system was operated properly, wastes generated at the site would be non-hazardous or the volume would be below regulated limits.

The expert therefore concluded that it was Lutesþ practice of dumping any and all liquid industrial waste down the sump which was the sole cause of the pollution. Lutesþ expert contested this conclusion.

It is well established that issues of evidentiary weight and witness credibility are within the province of the trial court, and that this Court will not substitute its judgment for that of the district court. In re Marriage of Abrahamson (1996), 924 P.2d 1334, 1338, 53 St.Rep. 939, 341 (citing In re Adoption of J.M.G. (1987), 226 Mont. 525, 528, 736 P.2d 967, 969). If the evidence presented at trial conflicts, it is the function of the District Court to resolve such conflicts. Abrahamson, 924 P.2d at 1338 (quoting In re

Marriage of Penning (1989), 238 Mont. 75, 78, 776 P.2d 1214, 1216). See also Rafanelli, 924 P.2d 242.

While the testimony presented was not undisputed, the Houdashelts presented extensive evidence to show that the pollution problem was concentrated solely in Pit 2, which was used by Lutes alone. The Houdashelts called numerous witnesses who testified to Lutesþ practice of indiscriminantly disposing of all waste into the sump, as well as his failure to clean the sump out or maintain it during his possession of the business. The Houdashelts also presented photographs showing the condition of the sump when they repossessed the business, and testified to the extensive effort they expended in cleaning and repairing the system. All this testimony was reflected in the District Courtþs finding that it was Lutesþ misuse of the sump system which caused the pollution problem, as well as its findings that the sump worked correctly and without contamination prior to the sale of the business to Lutes. Upon review, we determine that these findings were not clearly erroneous.   2. Did the District Court err in concluding that Lutes was not entitled to rescind the contract?

Lutes next argues that the District Court erred in not allowing him to rescind the contract. He offers three alternative theories in contending that rescission would have been proper. He asserts, in the alternative, that his consent to the contract was obtained by fraud; his consent was given by mistake; or the consideration underlying the contract failed.

Section 28-2-1711, MCA, provides that a party to a contract may rescind only:

(1) if the consent of the party rescinding or of any party jointly contracting with him was given by mistake or obtained through duress, menace, fraud, or undue influence exercised by or with the connivance of the party as to whom he rescinds or of any other party to the contract jointly interested with such party;

(2) if, through the fault of the party as to whom he rescinds, the consideration for his obligation fails in whole or in part;

(3) if such consideration becomes entirely void from any cause;

(4) if such consideration, before it is rendered to him, fails in a material respect from any cause; or

(5) if all the other parties consent.

Here, Lutes asserts that his consent to the contract was obtained either through fraud or by mistake, and further asserts that the consideration underlying the contract failed.

In making these arguments, Lutes cites no authority but instead concentrates on the alleged illegality and failure of the sump system. Lutes contends that the Houdashelts fraudulently failed to disclose that the sump system was not permitted. Lutes contends that, had he known this, he would never have entered into the contract. In the alternative, Lutes argues that he believed the sump system was permitted and in compliance with state and federal regulations, but he was mistaken. This mistake, Lutes argues, should allow him to rescind the contract. We determine that the District Court did not err in concluding that, under the circumstances of this case, Lutes was not entitled to rescind the contract.

Lutes cannot rescind the contract based upon his asserted mistaken belief that the sump system was permitted because  28-2-1715, MCA, provides that "[r]escission cannot be adjudged for mere mistake unless the party against whom it is adjudged can be restored to substantially the same position as if the contract had not been made." In this case, allowing Lutes to rescind the contract on the basis of mistake would not serve to restore the Houdashelts to the position they enjoyed before the contract was signed. The Houdashelts sold to Lutes a profitable business with a sump system which worked efficiently regardless of whether or not it had the proper permit. They sold him a business which had never encountered environmental difficulties or run afoul of the State for its waste disposal practices. Upon repossession, the Houdashelts received back from Lutes a business which was losing money. They received from him a business without a waste disposal system (because the State had ordered the sump shut down), but with a large pollution problem and a dwindling customer base. Allowing rescission based on Lutes' alleged mistake regarding whether the sump was permitted would not restore the Houdashelts to their pre-contract position and, therefore, is not allowed. Section 28-2-

1715, MCA.

Similarly, Lutes cannot rescind the contract based upon the Houdashelts' alleged fraudulent misrepresentation that the sump system was a legal and permitted system. In advancing this argument, Lutes contends that the Houdashelts' failure to disclose the fact that the sump system was not permitted amounted to constructive fraud.

Constructive fraud consists in:

(1) any breach of duty which, without an actually fraudulent intent, gains an advantage to the person in fault or anyone claiming under him by misleading another to his prejudice or to the prejudice of anyone claiming under him; or

(2) any such act or omission as the law especially declares to be fraudulent, without respect to actual fraud.

Section 28-2-406, MCA. This Court has held that constructive fraud requires the breach of a duty. Woodahl v. Matthews (1982), 196 Mont. 445, 451, 639 P.2d 1165, 1169. Further, if a party is unaware of a defect at the time of sale, he or she is under no duty to disclose it. Woodahl, 639 P.2d at 1169 (citing Moschelle v. Hulse (1980), 190 Mont. 532, 622 P.2d 155).

Here, the District Court determined that the Houdashelts believed the sump system was legal and covered by an appropriate permit at the time of sale. Therefore, assuming arguendo that the lack of a permit was a defect which should have been disclosed, the Houdashelts were nevertheless excused from disclosing it because of their own ignorance. Therefore, no constructive fraud existed in this case, and Lutes cannot rescind the contract on that basis.

Lutes also asserts a failure of consideration, once more premising his argument solely on the alleged lack of a proper permit for the sump system. He asserts that the consideration (the sump system) was unlawful, and, therefore, in violation of  28-2-803, MCA, which provides in part that "[t]he consideration of a contact must be lawful."

Aside from relying yet again on a hypothetical finding that the sump system was illegal (a finding the District Court specifically rejected, instead finding to the contrary that the sump was legal), Lutes' argument shows a fundamental misunderstanding of contract law.  Montana law provides that "any benefit conferred or agreed to be conferred upon the promisor by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered or agreed to be suffered by such person, other than such as he is at the time of consent lawfully bound to suffer, as an inducement to the promisor is a good consideration for a promise." Baker v. Berger (1994), 265 Mont. 21, 30,  873 P.2d 940, 945 (citing  28-2-801, MCA). In this case, the benefit received by the Houdashelts was the payment of the agreed-upon purchase price according to the schedule set up between the parties. The benefit received by Lutes was the tender of the business and its equipment. The contract, therefore, was for the simple sale of a business, and the consideration offered by each party to the other was not illegal.

3. Did the District Court abuse its discretion in awarding damages to the Houdashelts under the contract?

Lastly, Lutes argues that the Houdashelts were not entitled to the monetary damages awarded to them for past-due payments and clean-up costs. In so contending, Lutes makes numerous arguments based on a wide variety of broad contractual theories. He asserts that the contract violated public policy; the object of the contract was unlawful; and the contract was void. In making these arguments, Lutes cites to no relevant authority except the Montana statutes setting forth the cited theories. Again, his arguments are based exclusively upon the presumption that the sump system was illegal and that the asserted illegality somehow excused his mismanagement of the business. Suffice it to say that this Court has reviewed the District Court's factual findings and legal conclusions in detail, and finds no error therein.

Affirmed.

/S/  WILLIAM E. HUNT, SR.

We Concur:

/S/  J. A.  TURNAGE
/S/  JAMES C. NELSON
/S/  TERRY N. TRIEWEILER
/S/  JIM REGNIER