No. 05-046

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 40N

CREDIT SERVICE CO., INC.,

       Plaintiff and Respondent,

  v.

VICKI L. BENDER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
                   In and For the County of Yellowstone, Cause No. DV-04-0385
                   Honorable Russell C. Fagg, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

             Terry L. Seiffert, Attorney at Law, Billings, Montana

       For Respondent:

             Matthew L. Erekson, Attorney at Law, Billings, Montana

Submitted on Briefs:  October 18, 2005

Decided: February 28, 2006

Filed:

_____
                         Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1	Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and its case title, Supreme Court cause number and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2	Credit Service Co., Inc. (Credit Service), sued Vicki L. Bender (Bender) to collect a sum due on an account. The Thirteenth Judicial District Court, Yellowstone County, entered judgment for Credit Service on its findings of fact and conclusions of law, and Bender appeals. We affirm.

¶3	The issue is whether the District Court erred in entering judgment for Credit Service.

## BACKGROUND

¶4	On February 21, 2003, Bender and William Cato, III (Cato), entered into a written contract. Cato agreed to redraft and make changes required by the City of Billings, Montana, to an earlier preliminary plat, and also to provide a Conceptual Hydrology Report, for a proposed subdivision on Bender's property. By the contract's terms, Cato was to use the existing topography map and layout provided by Bender for the work on the preliminary plat. Moreover, the contract provided it "will not cover fees involving surveying or additional testing." Bender agreed to pay Cato a $2,000 retainer toward Cato's fee of $75 per hour, plus expenses, in a total amount not to exceed $8,000. The contract further provided:

2

This fee will not provide nor include in the above stated limit the following. During the course of this project other issues may arise which are not known at this time, if they effect [sic] the scope of the work for engineering services, then you will be notified and the scope of the work adjusted to reflect these factors.

The contract expressly stated that expenses from any services which might be required from a registered land surveyor (RLS) would be separately payable according to the RLS's rates. The contract closed with a statement that the total outstanding bill must be paid before Bender would receive "a plotted copy of the project."

¶5 Notwithstanding Bender's failure to pay the $2,000 retainer fee, Cato proceeded with the work and submitted the redrafted Preliminary Plat and Report to the City of Billings. On March 3, 2003, he sent Bender an invoice for the $6,975 balance due, including interest.

¶6 The City of Billings Planning and Community Services Department recommended conditional approval of the preliminary plat and the subdivision on March 25, 2003, with five recommended conditions. On March 28, 2003, Bender wrote a letter to Cato "answering" the recommended conditions and listing changes needed to the preliminary plat. Bender had not paid Cato any part of the invoiced amount at that time.

¶7 On April 29, 2003, the City of Billings conditionally approved Bender's subdivision preliminary plat application with conditions substantially similar to those made earlier. On May 9, 2003, Bender wrote Cato a letter stating that he was "fired for not performing the [subdivision] work properly." Bender outlined perceived deficiencies in the preliminary plat and did not pay Cato anything for his work.

3

¶8     In June of 2003, Cato assigned Bender's debt to Credit Service for collection, and in April of 2004, Credit Service filed the action underlying this appeal to collect the amount due. Bender denied the allegations of the complaint and argued that Cato was not a licensed engineer in the State of Montana with the authority to prepare subdivision plats, breached the contract and failed to perform, and was not entitled to any compensation due to his failure to perform.

¶9     The District Court held a bench trial at which Cato, Bender and a Credit Service representative testified. The court subsequently entered findings of fact, conclusions of law and a judgment for Credit Service in the amount of $6,745 plus interest. Bender appeals.

## STANDARD OF REVIEW

¶10     We review a district court's findings of fact to determine whether they are clearly erroneous. We review conclusions of law to determine whether they are correct. *Houdashelt v. Lutes* (1997), 282 Mont. 435, 441, 938 P.2d 665, 669.

## DISCUSSION

¶11     Did the District Court err in entering judgment for Credit Service?

¶12     The District Court found that Cato is not a licensed land surveyor or engineer and that the contract between the parties did not require a licensed land surveyor or engineer. The District Court also found that Cato submitted his bill and Bender did not pay, and that Cato assigned his right to collect the debt to Credit Service.

¶13     On appeal, Bender claims the District Court erred in finding that her contract with Cato did not require either a licensed land surveyor or a licensed engineer. She also contends

the District Court erred as a matter of law in concluding the contract was valid, legal and binding. Bender's primary argument is that the contract with Cato is void because it required Cato to perform engineering services and he was not a licensed engineer in Montana. She also argues Cato's work was not done properly, requiring her to terminate his services and hire an engineering firm to complete the work.

¶14 We first address Bender's challenge to the District Court's finding that the contract did not require a licensed land surveyor or engineer. Nothing in the contract expressly requires that Cato be a licensed land surveyor or engineer. Nor does Bender's testimony that "it was [her] understanding" that Cato was a licensed engineer insert such a requirement into the contract. Cato testified that drafting a preliminary plat is not engineering work and that a registered land surveyor would have to be hired to prepare a final plat. He testified that he agreed to perform drafting for Bender and that he provided drafting and design services. We conclude substantial evidence, in the form of the contract itself and Cato's testimony, supports the District Court's findings that Cato is not a licensed land surveyor or engineer and that the contract between the parties did not require a licensed land surveyor or engineer. The findings are not otherwise clearly erroneous.

¶15 Nevertheless, Bender advances several statutes which she contends support her claim that the contract required Cato to perform engineering services. First, she cites to § 76-3-103(12), MCA, which defines a preliminary plat for purposes of Chapter 3 of Title 76 (Local Regulation of Subdivisions), as "a neat and scaled drawing of a proposed subdivision showing the layout of streets, alleys, lots, blocks, and other elements of a subdivision that

5

furnish a basis for review by a governing body." She also quotes from § 76-3-608, MCA, which sets forth the criteria under which local governing bodies review a wide variety of matters relating to subdivisions. Having quoted these statutory provisions, however, Bender merely states in a conclusory fashion that the statutory scheme "[c]learly . . . requires extensive expertise" in submitting a preliminary plat. She fails to advance legal rationale or analysis under which her conclusory statement could establish error by the District Court with regard to an alleged contractual requirement for engineering services, as required by Rule 23(a)(4), M.R.App.P. It is not this Court's obligation to formulate arguments for a party in support of a position taken on appeal. *In re B.P.*, 2001 MT 219, ¶ 41, 306 Mont. 430, ¶ 41, 35 P.3d 291, ¶ 41 (citation omitted). Thus, we do not address these statutes further.

¶16    Bender also advances statutes relating to the practice and regulation of engineering, quoting §§ 37-67-101(6)(a)(i) and (ii), -301 and -332(1)(a)(i), MCA, as support for her position that the contract required engineering services Cato was not licensed to perform. Sections 37-67-101(6)(a)(i) and (ii), MCA, set forth the meaning of the term "practice of engineering" for purposes of licensing and regulating of engineers. Section 37-67-301, MCA, requires a license to practice or offer to practice engineering, while § 37-67-332(1)(a)(i), MCA, provides that a person commits a criminal offense if she or he knowingly practices or offers to practice engineering without being licensed to do so. As was true with the statutes set forth above, Bender quotes from them correctly. As was also true above, she fails to advance a legal analysis or rationale in this regard and, as a result, we do not address these statutes further. *See In re B.P.*, ¶ 41.

6

¶17    Bender also analogizes the present case to *Portable Embryonics, Inc. v. J.P. Genetics, Inc.* (1991), 248 Mont. 242, 810 P.2d 1197.  There, the plaintiff sued former employees for breach of employment contracts and related tortious conduct.   The employment contracts included trade secret protections and restrictions on employees who left the business, which involved performing non-surgical bovine embryo transfers.  The defendant former employees unsuccessfully sought summary judgment that the contracts were illegal because Montana statutes provide that such a procedure on an animal constitutes the practice of veterinary medicine which, pursuant to § 37-18-301, MCA, requires a veterinary license.   They appealed after a bench trial resulted in a judgment against them.   We determined that, pursuant to § 28-2-701, MCA, the object of an employment contract is not lawful if it is contrary to an express provision of law, and § 37-18-102(1)(f), MCA, stated that animal embryo transplants constituted the practice of veterinary medicine.  Consequently, because the defendants were not licensed veterinarians, we held that the employment contracts were void.  *Portable Embryonics*, 248 Mont. at 245, 810 P.2d at 1199.

¶18    *Portable Embryonics* has no application here.   In the present case, in contrast to *Portable Embryonics*, no statute or other legal authority advanced by Bender expressly provides that the acts Cato agreed to perform under the contract require a licensed engineer. Bender simply did not produce evidence refuting Cato's testimony that he agreed to perform drafting for her and that drafting a preliminary plat is not engineering work.

¶19    Bender also quotes the portion of the contract which refers to "other issues [which] may arise . . . [and] effect [sic] the scope of work for engineering services."  This language

does not establish that Cato agreed to perform services which may only be performed by a licensed engineer; nor did Bender produce testimony or other evidence supporting her position that Cato was to perform work which might fall within the broad phrase "engineering services" or constitute the unlicensed practice of engineering. Moreover, while Bender states that Cato represented to her that he was a licensed engineer, the record does not support her statement. She testified only that she was referred to Cato and that she "understood" he was a licensed engineer. Her testimony is woefully insufficient to establish an affirmative representation by Cato.

¶20 Finally, the evidence does not support Bender's claim that Cato's work was not properly done. Cato contractually agreed to prepare a Preliminary Plat and Hydrology Report, and he prepared those two documents. The District Court found that Cato prepared a Preliminary Plat and Conceptual Hydrology Report which received preliminary plat approval by the City of Billings on March 25, 2003, and April 29, 2003. Although Bender claims she was forced to get someone else to do the work starting over from scratch, she admitted the Preliminary Plat which Cato prepared was granted conditional approval by the City of Billings. She produced no evidence--other than her own after-the-fact "feeling" that Cato was not qualified--in support of her contention that the work was not properly done. The fact that she "fired" Cato after failing to pay him, and contracted with another entity, does not establish that Cato's work was not properly done. The record establishes that Cato completed his contractual obligations to prepare a Preliminary Plat and Conceptual Hydrology Report and that Bender was not entitled to additional work without payment.

8

¶21 We hold the District Court did not err in entering judgment for Credit Service.

¶22 Affirmed.

/S/ KARLA M. GRAY

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ JIM RICE