*Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, No. 14, September Term, 2016, Opinion by Adkins, J.

**TORTS — DUTY — ECONOMIC LOSS DOCTRINE:** In the absence of privity, physical injury, or risk of physical injury, the economic loss doctrine bars parties from bringing negligence claims for purely economic losses.

**TORTS — DUTY — PRIVITY-EQUIVALENT INTIMATE NEXUS:** The privity-equivalent duty analysis of the intimate nexus test from *Jacques v. First National Bank of Maryland*, 307 Md. 527 (1986), does not extend to design professionals on public construction projects. Therefore, in the absence of privity, physical injury, or risk of physical injury, a design professional cannot be held liable to a contractor on the same government construction project for purely economic losses. Accordingly, a general contractor's professional negligence and negligent misrepresentation causes of action against a government construction project's engineer fail. Additionally, because we decline to apply the privity-equivalent duty analysis in the public construction context, a general contractor's cause of action based on the Restatement (Second) of Torts § 552, a privity equivalent, also fails.

Circuit Court for Baltimore City
Case No.: 24-C-14-000060
Argued: October 6, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 14

September Term, 2016

BALFOUR BEATTY INFRASTRUCTURE, INC.

v.

RUMMEL KLEPPER & KAHL, LLP

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Getty
Battaglia, Lynne A. (Senior Judge,
        Specially Assigned),

JJ.

Opinion by Adkins, J.

Filed: February 21, 2017

In this appeal we revisit the elusive economic loss doctrine, to decide whether to extend a duty in tort to persons not in privity for the recovery of purely economic losses. Petitioner, a general contractor who successfully bid for work on a City of Baltimore construction project, argues that Respondent, the project's design engineering firm, owes it a tort duty of care because Respondent knew that Petitioner would rely on its designs in bidding and constructing the project. We shall hold, that, in the absence of contractual privity, physical injury, or risk of physical injury, design professionals in large government construction projects do not owe a tort duty to those who bid for and contract with a government entity.

## FACTS AND LEGAL PROCEEDINGS

The City of Baltimore ("City") contracted with Rummel Klepper & Kahl, LLP ("Engineer") to design upgrades to the Patapsco Wastewater Treatment Plant. Under the contract, Engineer was tasked with designing the plans for two interrelated projects, Sanitary Contract 852R ("SC 852R") and Sanitary Contract 845R ("the companion project").[1] According to Balfour Beatty Infrastructure, Inc.'s ("Contractor") complaint, Engineer's responsibilities under the contract included:

- Developing the design for SC 852R and its companion project;
- Developing drawings and specifications for prospective contractors to use when submitting bids and for the successful contractor to use for construction;

---

[1] The full names of these projects, as alleged in Balfour Beatty Infrastructure, Inc.'s ("Contractor") complaint, are "SC 845R - Nitrification Filters and Related Work for the Enhanced Nutrient Removal Facilities at Patapsco Wastewater Treatment Plant" and "SC 852R - Denitrification and Related Work for the Enhanced Nutrient Removal Facilities at Patapsco Wastewater Treatment Plant."

- Developing construction timetables for the projects;
- Providing responses to questions from prospective bidders regarding the design of the projects;
- Evaluating and commenting on contractors' bids;
- Evaluating and approving submissions from the successful contractor during construction;
- Inspecting the successful contractor's work during construction to ensure conformance with Engineer's design; and
- Evaluating and accepting the successful contractor's work and certifying the work to the City.

The City opened both projects up to bids through its competitive bidding process.[2] Contractors that submitted bids had to be prequalified as being able to complete the work required by the designs. Contractor[3] was the successful bidder for SC 852R.[4] Under its contract with the City, Contractor agreed to construct 34 denitrification filter cells ("DNF cells"), which are concrete tubs that hold untreated wastewater, next to the existing wastewater treatment facility. Contractor was also to construct "pipes and pipe support systems" for SC 852R. During construction, Contractor encountered leaking and other problems, which resulted in delays and cost overruns.

---

[2] The City of Baltimore ("City") solicited bids for SC 852R before SC 845R ("the companion project") even though both projects were to be completed around the same time.

[3] Fru-Con Construction Corporation ("Fru-Con"), Contractor's predecessor in interest, was prequalified to submit a bid for SC 852R. In 2009, Fru-Con secured the contract for the construction of SC 852R. The City then permitted Fru-Con to assign its agreement to Fru-Con Construction, LLC ("Fru-Con LLC"). Contractor later acquired all of the membership interests in Fru-Con LLC. In 2014, Contractor ultimately "fully absorbed" Fru-Con LLC as one of its divisions.

[4] Engineer claimed that Contractor secured contracts for the construction of both SC 852R and the companion project, but "[f]or reasons only known to the pleader," Contractor "has declined to allege that it holds the contracts with the City for both of the projects."

In 2014, Contractor filed a complaint against Engineer in the Circuit Court for Baltimore City seeking to recover its financial losses. According to Contractor's complaint, Engineer designed the DNF cells using expansion and contraction joints that were meant to accommodate changes in water pressure in the cells. On completion, the water retention ability of the DNF cells was tested. The testing revealed leaks due to cracks in the expansion joints. Contractor averred that it constructed the DNF cells according to Engineer's design, and any leaking from the expansion joints was a "direct result of deficiencies in [Engineer's] design." It alleged "substantial additional costs, expenses and time to remediate the leaks." Contractor also claimed that Engineer's "design of the pipe support system was defective," which caused it to suffer additional financial losses and delays.

Finally, Contractor averred that Engineer failed to timely complete the design for SC 852R's companion project, which "hindered and delayed" Contractor's construction of SC 852R. Engineer also allegedly failed to warn SC 852R's prospective bidders of the delayed completion of the companion project's design and established an unreasonable time line for the completion of SC 852R, which Contractor relied on when submitting its bid. As a result, Contractor claimed, it "incurred significant cost, expense and time for which [Engineer] is responsible."

In its three-count complaint against Engineer, Contractor brought a professional negligence claim, a negligent misrepresentation claim, and a cause of action based on Restatement (Second) of Torts § 552. As to the professional negligence claim, Contractor alleged that an "intimate nexus" and "contractual privity equivalent" existed between it and

3

Engineer, and that Engineer owed it a duty of reasonable care "exercised by similarly situated design professionals." Contractor further alleged that it was a foreseeable party who "would utilize and directly rely upon [Engineer's] professional services including, but not limited to, the preliminary and final design of [SC 852R]."

In its negligent misrepresentation claim, Contractor asserted that because Engineer designed the interrelated projects, it was aware that any delay in the design of the companion project would impact SC 852R. Contractor also claimed that Engineer intended prospective bidders like Contractor to rely on the time line it had developed for SC 852R when submitting bids for the project, and an intimate nexus and privity equivalent existed between it and Engineer, establishing a duty. In Contractor's words, Engineer owed it "a duty to fairly and accurately describe the contract duration for [SC 852R] as well as the status of the [companion project's] design." In addition, Contractor alleged, Engineer knew that the companion project's design was not sufficiently complete to allow for timely completion of SC 852R. Therefore, Contractor claimed, Engineer had a duty to advise prospective bidders, including Contractor, that SC 852R could not be completed within the time frame it had established. Finally, in its Restatement (Second) of Torts § 552 cause of action, Contractor alleged that Engineer provided designs, plans, and specifications for the construction of SC 852R, which contained deficiencies, and knew or should have known that Contractor would rely on those documents, causing it damages.

Engineer filed a motion to dismiss for failure to state a claim. In its motion, Engineer argued that without privity between the parties, no legally cognizable tort duty ran from Engineer to Contractor that would permit recovery of purely economic losses.

4

Engineer also argued that the intimate nexus test and Restatement (Second) of Torts § 552 concepts of extra-contractual duty do not apply to design professionals and, even if they did, Contractor failed to allege facts satisfying these tests.

The Circuit Court granted Engineer's motion to dismiss due to lack of privity between Contractor and Engineer. Contractor appealed. The Court of Special Appeals affirmed the dismissal of Contractor's complaint based on lack of privity. *Balfour Beatty Infrastructure, Inc. v. Rummel Klepper & Kahl, LLP*, 226 Md. App. 420 (2016). It held that the economic loss doctrine barred Contractor's negligence and negligent misrepresentation claims, and that privity equivalent concepts of extra-contractual duty did not apply in Contractor's case. *Id.* at 445, 452–53, 459–60.

We granted Contractor's Petition for Writ of Certiorari to consider the following questions:

> 1. Does the economic loss doctrine bar a general contractor's professional negligence claim against a design professional on a government construction project under the privity-equivalent analysis of the intimate nexus test?
>
> 2. Does the economic loss doctrine bar a general contractor's action for negligent misrepresentation against a design professional on a government construction project?
>
> 3. Does the economic loss doctrine bar a general contractor's action under the Restatement (Second) of Torts § 552 against a design professional on a government construction project?[5]

---

[5] We have edited, rephrased, and reordered the questions presented in Contractor's Petition for Writ of Certiorari:

> 1. Did the [Court of Special Appeals] err by applying the economic loss doctrine to a limited class of professionals–

Because we answer yes to all three questions and decline to apply the privity-equivalent component of the intimate nexus test, we shall affirm the judgment of the Court of Special Appeals.

## STANDARD OF REVIEW

We review a trial court's grant of a motion to dismiss to determine whether it was legally correct. *Kiriakos v. Phillips*, 448 Md. 440, 454 (2016) (citation omitted). In conducting this review, we assume that the facts and allegations in the complaint, and any inferences that may be drawn from them, are true and view them in a light most favorable to the non-moving party. *Rounds v. Md.-Nat'l Capital Park & Planning Comm'n*, 441 Md. 621, 636 (2015) (citation omitted). The Court does not, however, accept conclusory

---

designers in government contracts–to shield an engineer from liability to a contractor when the engineer knows that its services will be relied upon to the contractor's detriment if the engineer's services are negligently performed; i.e., [do] the intimate nexus and privity equivalent "tests" apply to an action by a contractor against an engineer?

2. Does the economic loss doctrine bar a government contractor's action under the Restatement (Second) of Torts § 552 against an engineer who negligently supplied information when all other elements are met and when other professional providers of information are not so protected?

3. Does the economic loss doctrine bar a government contractor's action for negligent misrepresentation against an engineer when the engineer: (a) intended the contractor to rely upon the representations (i.e., [its] design); (b) knew that the contractor would rely upon the design; and, (c) knew that the contractor would be harmed if the design was negligently performed?

6

allegations and assertions containing insufficient facts as true. *State Ctr., LLC v. Lexington Charles Ltd. P'ship*, 438 Md. 451, 497 (2014) (citation omitted). We only consider the well-pleaded facts to determine whether the complaint states a cause of action for which relief may be granted. *Id.*

## DISCUSSION

Contractor's overarching contention is that the economic loss doctrine[6] does not apply to its claims of professional negligence, Restatement (Second) of Torts § 552, and negligent misrepresentation because it only applies in products liability cases. Instead, Contractor avers, the intimate nexus test applies to its claims, and the allegations in its complaint satisfy the test. Therefore, Contractor asserts, Engineer owes it a duty of care and may be held liable in tort for the economic losses it has incurred.

Engineer urges us to apply the economic loss doctrine, which is a principle courts have used to limit the expansion of tort liability absent privity. Engineer avers that under this doctrine there is no liability without privity when a plaintiff has suffered only economic loss without physical injury or risk thereof.

### Professional Negligence

Contractor contends that Engineer is liable for damages it sustained under a negligence theory. Contractor asserts that Engineer owed it a duty of care, and Engineer breached that duty when it failed to: (1) properly design DNF cells and a pipe support system for the SC 852R project; (2) establish a reasonable timetable for the SC 852R

---

[6] The economic loss doctrine is also referred to as the "economic loss rule." We will use "economic loss doctrine" throughout this opinion for consistency.

7

project; (3) timely design the companion project; and (4) inform Contractor that completion of the companion project's design was delayed. Contractor avers that the allegations contained in its complaint establish a privity-equivalent intimate nexus between it and Engineer.[7] Therefore, Contractor contends, Engineer owed it a tort duty.

To establish a negligence claim, a plaintiff must allege facts showing that: (1) the defendant owes the plaintiff a duty of care; (2) the defendant breached that duty; (3) the plaintiff sustained an injury or loss; and (4) the defendant's breach of the duty was the proximate cause of the plaintiff's injury. *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 213 (2013) (citation omitted). In a negligence claim against a provider of professional services, the professional is held to the standard of care of his or her profession. *See Schultz v. Bank of Am., N.A.*, 413 Md. 15, 28–29 (2010). But without a duty of care, there is no liability in negligence. *Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 655 (2000) (citations omitted).

Maryland defines "duty" as "an obligation to which the law will give effect and recognition to conform to a particular standard of conduct toward another." *Jacques v. First Nat'l Bank of Md.*, 307 Md. 527, 532 (1986) (quoting J. Dooley, Modern Tort Law § 3.03, at 18–19 (1982, 1985 Cum. Supp.)). As Professors Prosser and Keeton have explained, duty is "an expression of the sum total of those considerations of policy which lead the law to say that the plaintiff is entitled to protection." W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 53, at 358 (5th ed. 1984). "To determine whether a tort

---

[7] Contractor concedes that it does not have a contract with Engineer.

8

duty exists in a particular context, we examine: (1) 'the nature of the harm likely to result from a failure to exercise due care,' and (2) 'the relationship that exists between the parties.'" *100 Inv. Ltd. P'ship*, 430 Md. at 213–14 (quoting *Jacques*, 307 Md. at 534).

*Privity, Tort Duty, and the Economic Loss Doctrine*

The economic loss doctrine represents a judicial refusal to extend tort liability to negligence that causes purely economic harm in the absence of privity, physical injury, or risk of physical injury.[8] *See Seely v. White Motor Co.*, 403 P.2d 145, 150–51 (Cal. 1965); *E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870–71 (1986) (applying the economic loss doctrine "to maintain a realistic limitation on damages"); *Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 128–29 (2007); 3 Dan B. Dobbs, Paul T. Hayden & Ellen M. Bublick, The Law of Torts § 607, at 462 (2d ed. 2011). Courts imposed this limitation on the recovery of purely economic losses in response to the elimination of the privity requirement in tort law.[9] *See Seely*, 403 P.2d at 150–51. In Maryland, the economic loss

---

[8] Before the rise of negligence in the early twentieth century, courts typically required privity of contract to find a tort duty, even in cases of physical injury. This rule originated from the 1842 English case, *Winterbottom v. Wright*, 152 Eng. Rep. 402 (1842). In *Winterbottom*, the Court of the Exchequer ruled that the driver of a stagecoach who was injured when its wheel collapsed had no cause of action against the defendant who had been hired to maintain the coach because there was no privity of contract between them. Although the court only held that there was no breach of contract action, courts interpreting the case took it to mean that a tort action was also precluded. *See* W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 104A, at 668 (5th ed. 1984); *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 27 n.3 (1986).

[9] The origin of the economic loss doctrine in its modern form is typically traced to *Seely v. White Motor Company*, 403 P.2d 145 (Cal. 1965) (Traynor, C.J.), a products liability case. 5 Philip L. Bruner & Patrick J. O'Connor, Jr., Bruner & O'Connor Construction Law § 17:89 (2002). In *Seely*, David Seely purchased a truck manufactured

9

doctrine bars recovery when the parties are not in privity with one another or the alleged negligent conduct did not result in physical injury or risk of severe physical injury or death. *Lloyd*, 397 Md. at 128–29; *see also Morris v. Osmose Wood Preserving*, 340 Md. 519, 531–32 (1995); *U.S. Gypsum Co. v. Mayor & City Council of Balt.*, 336 Md. 145, 156 (1994); *A.J. Decoster Co. v. Westinghouse Elec. Corp.*, 333 Md. 245, 251 (1994); *Council of Co-Owners Atlantis Condo., Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18, 22 (1986).

We discussed the evolution of tort law and the economic loss doctrine in the construction context in *Whiting-Turner*. In that case, condominium owners brought a negligence suit against the general contractor and architect who constructed their condominiums, alleging that defectively constructed electrical ductwork had created a fire hazard, rendering the units uninhabitable.[10] We recognized that

---

by White Motor Company from Southern Truck Sales for his heavy-load hauling business. Right after purchase, Seely noticed that the truck "bounced violently." *Seely*, 403 P.2d at 147. Ultimately the brakes on the truck failed and the truck flipped over, but Seely did not sustain any injuries. Seely then sued Southern and White for damages to repair the truck, lost profits, and the money he had paid toward the purchase price. *Id.* at 147–48.

The California Supreme Court held that Seely could recover damages for lost profits and money paid toward the purchase price of the truck on a warranty theory of liability. *Id.* at 148. In so holding, the court rejected a strict products liability theory of recovery because consumers do not typically communicate their economic expectations to manufacturers and manufacturers cannot use disclaimers to limit their liability. *Id.* at 150. If this were the case, the court reasoned, the manufacturer "would be liable for damages of unknown and unlimited scope." *Id.* at 150–51. Thus, absent an agreement, the manufacturer should not be held liable for losses that were purely economic. *Id.* at 151.

[10] The owners did not allege that the ductwork was negligently designed. *Whiting-Turner*, 308 Md. at 22–23.

10

privity is not an absolute prerequisite to the existence of a tort duty in this type of case, and that the duty of builders and architects to use due care in the design, inspection, and construction of a building extends to those persons foreseeably subjected to the risk of personal injury because of a latent and unreasonably dangerous condition resulting from that negligence.

*Whiting-Turner*, 308 Md. at 22. Therefore, we concluded, the condominium owners could recover the reasonable cost of fixing the defective ductwork even without privity or actual physical harm. *Id.* at 35.

In reaching its holding, the *Whiting-Turner* Court discussed the traditional requirement of privity in construction cases and the erosion of that requirement:

> In its early development, the law relating to builders and architects generally held that their duty did not extend to those with whom they had no contractual privity. Gradually, however, exceptions to the general rule of nonliability were judicially recognized. Actions in negligence were permitted, for example, where the contractor had practiced fraud or deceit or had deliberately concealed defects in the work; where construction created a condition that was imminently or inherently dangerous; or where the contractor created a nuisance per se.

*Id.* at 24–25 (footnote omitted). Examining the gradual progression of tort law, the Court relied on Professors Harper, James, and Gray for their acknowledgment that in building and construction work "[t]he modern tendency has been to measure the scope of duty here by the same broad principles of negligence as are generally applied in the field of accidental injuries." *Id.* at 26 (quoting 3 F. Harper, F. James & O. Gray, The Law of Torts § 18.5, at 708–10 (2d ed. 1986)). The Court concluded, "[T]he rule of nonliability . . . has now evolved into a general rule of liability where the result of negligence is the creation of **a**

11

**dangerous condition**." *Id.* at 27 (emphasis added). To explain this duty, it used the words

of Professors Prosser and Keeton:

> [T]he contractor is liable to all those who may foreseeably be injured by the structure, not only when he fails to disclose dangerous conditions known to him, *but also when the work is negligently done*. This applies not only to contractors doing original work, but also to those who make repairs, or install parts, as well as supervising architects and engineers. There may be liability for negligent design, as well as for negligent construction.

*Id.* at 27–28 (emphasis in original) (quoting W. Page Keeton et al., Prosser and Keeton on

the Law of Torts § 104A, at 723 (5th ed. 1984)). Therefore, the recovery of economic

losses for the repair or remedy of defective conditions was permitted, provided it was

necessary to prevent physical injury. In other words, the prospect of physical injury was

sufficient to warrant imposing a tort duty in the absence of privity.

### *The Intimate Nexus Test*

In cases where there were no safety concerns and the risk was purely economic, as

in this case, the privity requirement did not erode so quickly or so far. Instead, in such

cases we have refrained from finding a tort duty absent privity or its equivalent—i.e., an

"intimate nexus."[11] *Jacques*, 307 Md. at 537; *Walpert*, 361 Md. at 681; *see also 100 Inv.*

*Ltd. P'ship*, 430 Md. at 219. Put differently, the intimate nexus test requires the

relationship between the parties to be sufficiently close—or intimate—to support finding a

---

[11] The test's name originates from the oft-quoted Judge Cardozo opinion, *Ultramares Corporation v. Touche*, 174 N.E. 441 (N.Y. 1931), in which he discussed the "intimacy of the resulting nexus" that "was so close as to approach that of privity, if not completely one with it" such that the relationship between the parties would warrant finding a duty. *Id.* at 445–46.

tort duty.  *Jacques*, 307 Md. at 535.  In these cases, if an intimate nexus was established, a duty of care was owed, and the defendant could be held liable to the plaintiff for pecuniary losses.  *Id.* at 534.

In *Jacques*—where we adopted the intimate nexus test—the Court ruled that a bank owed its customers a duty of reasonable care in processing a home loan application.  In reaching its holding, the Court discussed two leading cases from the Court of Appeals of New York—*Glanzer v. Shepard*, 135 N.E. 275 (N.Y. 1922), and *Ultramares Corporation v. Touche*, 174 N.E. 441 (N.Y. 1931)—to determine whether an intimate nexus existed between the parties and, consequently, a duty of care was owed.  *Jacques*, 307 Md. at 535–36.  In *Glanzer*, the court permitted a bean purchaser to recover purely economic losses in tort from a public bean weigher even though the weigher's contract was with the bean seller.  *Glanzer* held that the weigher owed a duty in tort to the purchaser because the sale of the beans was the end goal of the transaction, and, as a public weigher, in undertaking to weigh the beans he assumed a duty to do so with reasonable care.  *Glanzer*, 135 N.E. at 276–77.  In discussing *Glanzer*, the *Jacques* Court emphasized the nature of the contractual relationship between the seller and the weigher and that the weigher held itself out as "skilled and careful in its calling."  *Jacques*, 307 Md. at 535–36 (citing *Glanzer*, 135 N.E. at 276).

In *Ultramares*, on the other hand, the same court declined to impose a tort duty of care running from accountants to recipients of their audit reports for alleged negligent misrepresentations in the reports.  The *Ultramares* court reasoned that if it imposed a duty, a "thoughtless slip or blunder . . . may expose accountants to a liability in an indeterminate

13

amount for an indeterminate time to an indeterminate class." *Ultramares*, 174 N.E. at 444.

Distinguishing *Glanzer*, the *Ultramares* court reasoned that the "intimacy of the resulting nexus" between the weigher and the purchaser "was so close as to approach that of privity, if not [be] completely one with it," which warranted finding a tort duty. *Id.* at 445–46. The court found that the accountants in *Ultramares*, by contrast, did not have such a relationship with the recipients of their audit reports. *Id.* at 446. The *Jacques* Court emphasized that even though the accountants were generally on notice that nonclients might rely on their audit reports, the relationship between them and the nonclients was not close enough to support finding an intimate nexus—and corresponding tort duty—like in *Glanzer*. *Jacques*, 307 Md. at 536.

The *Jacques* Court concluded:

> As the magnitude of the risk increases, the requirement of privity is relaxed—thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent.

*Id.* at 537.

Relying on *Glanzer* and *Ultramares*, the *Jacques* Court "examin[ed] carefully the relationship that existed between these parties" because "the harm likely to result from negligent processing of a loan application is limited to economic loss." *Id.* at 535. The Court found that the relationship between the parties amounted to a contract because the bank agreed to process the customers' loan application and "lock in" a specific interest rate

14

in exchange for a processing fee. *Id.* at 537–38. This contract, the Court reasoned, included an implied promise by the bank to use reasonable care in processing the application. *Id.* at 540. The Court also considered the customers' reliance on the bank and found that they were "particularly vulnerable and dependent on the [b]ank's exercise of due care" because the bank was aware of the restrictive financing provisions in the customers' contract for sale, which required them to settle with whatever loan they could obtain at the agreed rate of interest. *Id.* at 540–41. Therefore, we held that the bank owed the customers a duty in tort.

Based on Judge Cardozo's description of the defendants' professions as a "public calling" in *Glanzer* and *Ultramares*, the *Jacques* Court also found relevant "the nature of the business of the party upon whom the burden is sought to be imposed." *Id.* at 541. The Court emphasized the "public nature" of the bank. *Id.* at 542. It reasoned that the banking industry is "affected with the public interest" and banks and their officers have been "held to a high degree of integrity and responsiveness to their public calling," which also supported finding a tort duty. *Id.*

Fourteen years later, in *Walpert*, an accountant liability case*,* we adopted the three-part test from *Credit Alliance Corporation v. Arthur Andersen & Co*., 483 N.E.2d 110 (N.Y. 1985), as one way to establish an intimate nexus between parties. *Walpert*, 361 Md. at 674. The *Credit Alliance/Walpert* test requires the plaintiff to show: (1) the accountants were aware that their financial reports were to be used for a particular purpose; (2) a known party was intended to rely on the reports; and (3) conduct linking the accountants to the party that demonstrates the accountants' understanding of the party's reliance. *Id.* In

15

adopting the test, we noted that the reason for requiring privity or its equivalent to impose

tort liability is "to limit the defendant's risk exposure to an actually foreseeable extent, thus

permitting a defendant to control the risk to which the defendant is exposed." *Id.* at 671.

After examining duty analyses from other jurisdictions, the Court concluded that the *Credit*

*Alliance* test most closely reflected Maryland's policy concerns because it would "limit[ ]

the unpredictable and unlimited nature of economic damages." *Id.* at 675.

Initially, the *Credit Alliance/Walpert* test applied only to accountants, but we have

since applied it to title examiners. *See 100 Inv. Ltd. P'ship*, 430 Md. at 222. But *Walpert*

is the only case in which we have used the test to find an intimate nexus between an

individual and a third party not in privity.[12]  361 Md. at 693–94.

We have, however, considered whether there was an intimate nexus between parties

without applying the *Credit Alliance/Walpert* test. We found that the parties' relationship

**lacked** an intimate nexus in the following cases: *Blondell v. Littlepage*, 413 Md. 96 (2010)

(no tort duty owed by one attorney to another in joint representation); *Remsburg v.*

*Montgomery*, 376 Md. 568 (2003) (leader of a hunting party owed property owners no duty

of care); *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md. 639 (1999) (insurance agent who failed

---

[12] In the only other case that applied all three of the test's criteria and found an intimate nexus, *100 Investment Limited Partnership v. Columbia Town Center Title Co.*, 430 Md. 197 (2013), the parties were in direct privity. *Id.* at 223.

We did, however, find a privity-equivalent intimate nexus between the third-party drawer of a check and a depositary bank in *Chicago Title Insurance Co. v. Allfirst Bank*, 394 Md. 270 (2006). But, as we will discuss, *infra*, in *Chicago Title* we only examined the third element of *Credit Alliance/Walpert* test—linking conduct showing understanding of a party's reliance. *Id.* at 299.

16

to obtain insurance not liable to accident victim); *Noble v. Bruce*, 349 Md. 730 (1998) (attorney not liable to non-client beneficiaries of a will); *Erie Ins. Co. v. Chops*, 322 Md. 79 (1991) (insurer's failure to comply with statutory duty to report lapse in motorist's coverage to the Motor Vehicle Administration did not render it liable to accident victims).

In other situations, we considered the relationship between the parties sufficient to establish an intimate nexus. *Weisman v. Connors*, 312 Md. 428 (1988), involved an employee who sued his employer for alleged negligent misrepresentations made during pre-employment negotiations—at two in-person meetings and in several phone conversations the employer had made certain promises to induce him to leave his previous employer. *Id.* at 432–33. Because the employer's objective was to "sell" the employee on the idea of leaving his current employer during "face-to-face precontractual discussions," we held that a jury could find that there was an intimate nexus between the parties. *Id.* at 448–49. In reaching this conclusion, we reasoned that the employee "had a great stake in receiving accurate information" and the employer "had to realize that negligence on his part in conveying such information could result in considerable economic harm to [the employee]." *Id.* at 449. Because their relationship "more closely resemble[d] the intimacy of the *Glanzer* parties than the remoteness of the *Ultramares* relationship," the jury could find a tort duty. *Id.* Similar negligent misrepresentations in "intensive communications" regarding employment were the basis for liability in *Griesi v. Atlantic General Hospital Corporation*, 360 Md. 1 (2000).[13] *Weisman* and *Griesi* illustrate that we consider the

---

[13] The hospital's CEO had extended a job offer to a physical therapist, which he accepted. *Griesi v. Atl. Gen. Hosp. Corp.*, 360 Md. 1, 6 (2000). But when he appeared at

17

closeness of the relationship between the parties—especially one party's reliance on the other party's exercise of due care—when determining whether there is an intimate nexus that would support finding a duty of care.

In *Chicago Title Insurance Co. v. Allfirst Bank*, 394 Md. 270 (2006), we found a privity-equivalent intimate nexus between the third-party drawer of a check and a depositary bank. Without citing the *Credit Alliance/Walpert* test, we used one of its criteria in our analysis—linking conduct.[14] *Id.* at 299. The check at issue was made payable to the depositary bank (not the bearer) for the purpose of paying off a customer's mortgage loan as part of a refinancing. *Id.* at 278. Instead of applying the funds to the outstanding balance, the depositary bank credited the customer's personal, non-mortgage account. *Id.* When the customer then defaulted on his loan, the drawer—the title company that conducted the settlement—learned that the funds had been misapplied and the original

---

the hospital on his start date, he was told that the hospital used outside contractors for its physical therapy services and, consequently, no position was available for him. *Id.* at 7–8. We concluded that "intensive communications," including an in-person interview, several telephone conversations, and oral and written job offers communicating a starting date and salary, established an intimate nexus. *Id.* at 16. In our analysis, we "weigh[ed] heavily" that the hospital "had exclusive control" of material information the physical therapist needed to understand the situation, but never disclosed this information. *Id.* at 17. We also found important the physical therapist's reliance on the CEO's "positive and unequivocal representations of an employment opportunity" and his "authority, or apparent authority," to make a job offer. *Id.*

[14] Although *Chicago Title* did not address why the other elements of the *Credit Alliance/Walpert* test did not apply, those elements require the dissemination of reports or other information. *See Walpert, Smullian & Blumenthal, P.A. v. Katz*, 361 Md. 645, 674 (2000). *Chicago Title* involved a bank that deposited a check into a customer's account even though it was not made out to him; no reports or information were disseminated. Therefore, it was not necessary to consider those elements.

mortgage had never been released. *Id.* at 279. In finding an intimate nexus, we reasoned that the depositary bank had already received one check from the drawer and a payoff request from the new lender. *Id.* at 298–99. Thus, the bank knew, or should have known, that the title company expected the proceeds of the check to pay off the loan. *Id.* As a result, we held that the depositary bank had a duty to the title company to exercise due care in handling its check. *Id.* at 300.

These cases illustrate that regardless of whether we apply the *Credit Alliance/Walpert* test, our privity-equivalent analysis in economic loss cases looks for linking conduct—enough to show the defendant knew or should have known of the plaintiff's reliance. This means, of course, that context is critical. *Blondell*, 413 Md. at 122 (quoting Dan B. Dobbs, The Law of Torts § 229 (2000)) ("Relationship of the parties is so pervasively important in determining existence and measure of duty that it often goes unmentioned."). We have yet to apply the *Credit Alliance*/*Walpert* test or the privity-equivalent analysis in the public construction context and, as discussed below, Engineer argues that there are many reasons why we should not do so.

*The Construction Industry and the Privity-Equivalent Intimate Nexus Analysis*

First, Engineer avers, the *Credit Alliance/Walpert* criteria only apply to accountants. Second, Engineer argues that in the construction industry parties "must be able to rely on the objective expression of their bargains," which involves a network of contracts detailing liability between the parties involved in the project. Without a contract, Engineer contends, the economic loss doctrine bars Contractor's claims. Contractor, on the other hand, asserts

19

that its lack of a contract with Engineer is precisely why we should permit it to bring a negligence claim under the intimate nexus test.

Jurisdictions are split over whether to apply the economic loss doctrine in the construction context.[15] *See* A. Holt Gwyn, *Tort Damages*, *in* Construction Damages and Remedies 207, 212 (W. Alexander Mosley ed., 2d ed. 2013); *LAN/STV v. Martin K. Eby Const. Co.*, 435 S.W.3d 234, 249 (Tex. 2014) ("[T]he courts are fairly evenly divided over whether to apply the economic loss rule in [design professional liability to third party] situation[s]." (footnote omitted)). A number of states support Engineer's position, applying the economic loss doctrine to parties in the construction industry to bar tort claims for purely economic losses and limit parties to contractual remedies. *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 74, 75 (Colo. 2004) (economic loss doctrine barred subcontractor's negligence and negligent misrepresentation claims against engineering firm and inspector); *Indianapolis-Marion Cty. Pub. Library v. Charlier Clark & Linard,*

---

[15] In the construction context, case law on the economic loss doctrine is conflicting, confusing, and varies widely from jurisdiction to jurisdiction. *See* A. Holt Gwyn, *Tort Damages*, *in* Construction Damages and Remedies 207, 212 (W. Alexander Mosley ed., 2d ed. 2013). As one legal scholar remarked,

> It is in the context of construction design professional services that the application of the economic loss [doctrine] is most difficult to reconcile. No analytical theme predominates. It is almost as if someone had written the words "privity," "special relationship," "foreseeability," "supervising architect," "no duty," and "covered by another contract" on the six sides of a die, and then passed the die to appellate judiciaries of various states to roll. The only constant is that economic damages are the subject of the claim.

A. Holt Gwyn, *The Economic Loss Rule*, *in* Construction Damages and Remedies 267, 293.

*P.C.*, 929 N.E.2d 722, 740 (Ind. 2010) (economic loss doctrine precluded negligence claims by an owner against parties connected to it through "a network or chain of contracts"); *LAN/STV*, 435 S.W.3d at 249–50 (economic loss doctrine bars negligence and negligent misrepresentation claims by general contractors against architects for delay damages); *Berschauer/Phillips Const. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986, 990 (Wash. 1994) ("[T]he economic loss rule does not allow a general contractor to recover purely economic damages in tort from a design professional."); *Rissler & McMurry Co. v. Sheridan Area Water Supply Joint Powers Bd.*, 929 P.2d 1228, 1235 (Wyo. 1996) (economic loss doctrine barred Restatement (Second) of Torts § 552 claim by contractor against engineer); *see also* Marc Schneier, *Tort Liability of Project Architect or Engineer for Economic Damages Suffered by Contractor or Subcontractor*, 61 A.L.R.6th 445 § 11 (2011).

States applying the economic loss doctrine to bar recovery typically reason that the construction industry is governed by a network of often-complicated contracts, and because the parties have carefully contracted to protect against economic losses, there is no reason to add a tort remedy to the mix for use by parties claiming such losses. *See, e.g.*, *Indianapolis-Marion Cty. Pub. Library*, 929 N.E.2d at 740 ("[W]hen it comes to claims for pure economic loss, the participants in a major construction project define for themselves their respective risks, duties, and remedies in the network or chain of contracts governing the project."); *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 89 (Nev. 2009) ("In the context of engineers and architects, the bar created by the economic loss doctrine applies to commercial activity for which contract law is better suited to

21

resolve professional negligence claims."); *LAN/STV*, 435 S.W.3d at 249 ("[C]ourts should use contract principles, not tort principles, to determine whether the architect has 'contractual' obligations to the contractors and subcontractors." (footnote omitted)); *Berschauer/Phillips*, 881 P.2d at 992 (limiting recovery of economic losses due to construction delays to contractual remedies "to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract").

States that decline to apply the economic loss doctrine to bar recovery, on the other hand, typically focus on classic tort principles to decide whether a design professional owes a third party contractor a duty in tort in the absence of contractual privity. *See Jim's Excavating Serv., Inc. v. HKM Assocs.*, 878 P.2d 248, 255 (Mont. 1994) ("[W]e hold that a third party contractor may successfully recover for purely economic loss against a project engineer or architect when the design professional knew or should have foreseen that the particular plaintiff or an identifiable class of plaintiffs were at risk in relying on the information supplied."); *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 286–87 (Pa. 2005) (general contractor could bring negligent misrepresentation claim based on Restatement (Second) of Torts § 552 against architect); *Forte Bros., Inc. v. Nat'l Amusements, Inc.*, 525 A.2d 1301, 1303 (R.I. 1987) (not-in-privity contractor could bring negligence claim against supervising architect because it "directly and reasonably relied on [the architect's] rendering of [its] contractual duty as supervising architect/site engineer of the construction project"); *E. Steel Constructors, Inc. v. City of Salem*, 549 S.E.2d 266, 275 (W. Va. 2001) (holding that contractors can bring negligence claims against design

professionals "notwithstanding the absence of privity of contract"); *Guardian Const. Co. v. Tetra Tech Richardson, Inc.*, 583 A.2d 1378, 1386 (Del. Super. Ct. 1990) ("[P]rivity of contract is not an indispensable prerequisite to the recovery of economic damages in negligence cases . . . .").

Some of these courts hold that if there is a "special relationship" or privity-equivalent relationship—like Maryland's intimate nexus—a design professional owes a third party a tort duty, thus permitting the recovery of purely economic damages. *See, e.g.*, *Ossining Union Free Sch. Dist. v. Anderson LaRocca Anderson*, 539 N.E.2d 91, 94 (N.Y. 1989) (requiring "actual privity of contract between the parties or a relationship so close as to approach that of privity" to recover purely economic losses); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 463 S.E.2d 85, 88–89 (S.C. 1995) ("When . . . there is a special relationship between the alleged tortfeasor and the injured party not arising in contract, the breach of that duty of care will support a tort action."); *E. Steel Constructors, Inc.*, 549 S.E.2d at 275 (permitting contractor to bring negligence claim against design professional "due to the special relationship that exists between the two"); *Clevecon, Inc. v. Ne. Ohio Reg'l Sewer Dist.*, 628 N.E.2d 143, 146 (Ohio Ct. App. 1993) ("[L]ack of privity is not an absolute bar to a design professional's malpractice action when there is a nexus that can serve as a substitute for privity.").

Both sets of cases provide good policy reasons to expand or limit tort liability in the construction industry, and there is no clear majority position. We are not persuaded by Engineer's arguments that the *Credit Alliance/Walpert* test must be limited to accountants. As we have said, "even states which limit tort actions for negligent performance of a

23

contract generally permit recovery in tort for economic losses caused by the negligent services of a professional." *100 Inv. Ltd. P'ship*, 430 Md. at 228 (citation omitted). We have emphasized that "in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill," regardless of whether the parties are in contractual privity. *Jacques*, 307 Md. at 541. These occupations include "professionals such as physicians, attorneys, architects, and public accountants." *Id.* Instead, we find persuasive the logic of states barring negligence claims for purely economic damages against design professionals in complex construction projects absent privity. But our view turns on the unique aspects of large-scale public construction, rather than the finer distinctions of tort law.

The New York Court of Appeals, in *Ossining*, extended the *Credit Alliance* test to design professionals in the construction industry.[16] *Ossining*, 539 N.E.2d at 95. Although

---

[16] Although New York extended the *Credit Alliance* test to architects and other design professionals, its intermediate appellate courts have consistently declined to find an intimate nexus between the plaintiff and the design professional. *See Bri-Den Const. Co. v. Kapell & Kostow Architects, P.C.*, 867 N.Y.S.2d 437, 438 (N.Y. App. Div. 2008) (no intimate nexus because bidders unknown to defendants at time of alleged negligence); *Marcellus Const. Co. v. Vill. of Broadalbin*, 755 N.Y.S.2d 474, 476 (N.Y. App. Div. 2003) (plaintiff-contractor not a known party because it was merely a potential bidder that was not "part of a definable class which would rely on the plans" (citation omitted)); *Prudential-Bache Sec., Inc. v. Resnick Water St. Dev. Co.*, 555 N.Y.S.2d 367, 369 (N.Y. App. Div. 1990) (no intimate nexus between mechanical engineering consultants and electrical and air conditioning system contractor not in privity with one another); *Briar Contracting Corp. v. City of N.Y.*, 550 N.Y.S.2d 717, 718 (N.Y. App. Div. 1989) (no intimate nexus between general contractor and on-site engineering services inspector because there was no contract between the parties and inspector's contract with owner expressly limited its authority); *see also Williams & Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1183 (2d Cir. 1993) (answering questions at pre-bid meeting and forwarding plan clarifications was "isolated contact" insufficient to establish linking conduct between general contractor and design professional); *Travelers Cas. & Sur. Co. v.*

acknowledging that the *Credit Alliance* test had developed "in the context of cases involving accountants," the court refused to draw a "categorical distinction" between architects and accountants. *Id.* at 94–95. Instead, the court emphasized, the test "reflects our concern for fixing an appropriate ambit of duty." *Id.*

Although we share New York's reluctance to create a categorical distinction (and protection) for architects, we think the complex web of contracts that typically undergirds a public construction project should govern because parties have sufficient opportunity to protect themselves (and anticipate their liability) in negotiating these contracts. An Indiana case explains the construction industry's contractual landscape well:

> Perhaps more than any other industry, the construction industry is vitally enmeshed in our economy and dependent on settled expectations. The parties involved in a construction project rely on intricate, highly sophisticated contracts to define the relative rights and responsibilities of the many persons whose efforts are required—owner, architect, engineer, general contractor, subcontractor, materials supplier—and to allocate among them the risk of problems, delays, extra costs, unforeseen site conditions, and defects. Imposition of tort duties that cut across those contractual lines disrupts and frustrates the parties' contractual allocation of risk and permits the circumvention of a carefully negotiated contractual balance among owner, builder, and design professional.

*Indianapolis-Marion Cty. Pub. Library*, 929 N.E.2d at 737–38 (quoting Sidney R. Barrett, Jr., *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis*, 40

---

*Dormitory Auth.-State of N.Y.*, 734 F. Supp. 2d 368, 382–85 (S.D.N.Y. 2010) (no intimate nexus because contractor was "one of multiple potential bidders"). *But see Reliance Ins. Co. v. Morris Assocs., P.C.*, 607 N.Y.S.2d 106, 107 (N.Y. App. Div. 1994) (finding an intimate nexus because elements of *Credit Alliance* test were satisfied).

S.C. L. Rev. 891, 941 (1989)); *see also BRW, Inc.*, 99 P.3d at 72 ("In the context of larger construction projects, multiple parties are often involved. These parties typically rely on a network of contracts to allocate their risks, duties, and remedies . . . . [T]he parties do have the opportunity to bargain and define their rights and remedies, or to decline to enter into the contractual relationship if they are not satisfied with it." (citation omitted)).

We are also mindful that government contracts have a special consideration—the public purse. Imposing a tort duty on design professionals will likely correlate with an increase in project costs and with a corresponding rise in price for government entities.[17] *See Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) ("The imposition of liability on Government contractors will directly affect the terms of Government contracts: either the contractor will decline to manufacture the design specified by the Government, or it will raise its price."); *LAN/STV*, 435 S.W.3d at 248 ("[I]mposing the risk of economic loss on the architect requires the architect to pass the cost along to the owner."); *Berschauer/Phillips*, 881 P.2d at 992 ("If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. . . . The fees charged by architects, engineers, contractors, developers, vendors, and so on are founded on their expected liability exposure as bargained and provided for in the contract.").

---

[17] Although the same cost increase may well occur in private projects, see *Terracon Consultants W., Inc. v. Mandalay Resort Grp.*, 206 P.3d 81, 87–88 (Nev. 2009), that is not the subject of today's appeal, and other considerations may apply.

Although we decline to extend the privity-equivalent intimate nexus test to design professionals on government construction projects, we do not hold that the test cannot apply to design professionals in other contexts.

**Negligent Misrepresentation and Restatement (Second) of Torts § 552**

"Negligent misrepresentation is one variety of a negligence action," *Walpert*, 361 Md. at 655, so Contractor's negligent misrepresentation claim also depends on its ability to establish a duty on the part of Engineer.[18]  Because we decline to extend the privity-equivalent analysis to the public construction context, Contractor cannot satisfy the duty element using that test.

Relying on *Village of Cross Keys, Inc. v. U.S. Gypsum Co.*, 315 Md. 741 (1989), a case decided before we adopted the *Credit Alliance/Walpert* test, Contractor argues that to establish a duty under a negligent misrepresentation theory, the defendant only needs to know the class of potential plaintiffs, not the specific potential plaintiff.  Contractor's reliance on *Village of Cross Keys* is misplaced.

---

[18] To establish a negligent misrepresentation claim, the plaintiff must show:

> (1) the defendant, owing a duty of care to the plaintiff, negligently asserts a false statement; (2) the defendant intends that his statement will be acted upon by the plaintiff; (3) the defendant has knowledge that the plaintiff will probably rely on the statement, which, if erroneous, will cause loss or injury; (4) the plaintiff, justifiably, takes action in reliance on the statement; and (5) the plaintiff suffers damage proximately caused by the defendant's negligence.

*Lloyd v. Gen. Motors Corp.*, 397 Md. 108, 135–36 (2007) (citations omitted).

In *Village of Cross Keys*, a condominium developer and architect sued the manufacturer that designed a curtain wall system for negligent misrepresentation, alleging that errors in the design documents, upon which they relied in constructing a curtain wall, resulted in water leaks in several condominium units. *Id.* at 745, 748. The manufacturer had paid to publish the design in a construction industry trade catalogue that design professionals, including the architect in the case, purchase. *Id.* at 757 n.6. The Court held that the manufacturer did not owe the developer and architect a duty of care because they had not used several of the manufacturer's component parts required by the design. *Id.* at 759–60. In dicta, the Court declined to foreclose the possibility that a manufacturer could be held liable for deficiencies in such designs. *Id.* at 758–59. The Court stated, "Although the group of persons who may be expected to rely upon information of this kind may be large, they are identifiable, particularly if the group is limited to architects and structural engineers. That their names cannot be known in advance is of no consequence." *Id.* at 758. The Court emphasized that the reason the manufacturer could be held liable was that it would profit from the sale of its component parts as a result of publishing the design in the catalogue. *Id.* at 759.

Contractor argues that this dicta supports imposing a tort duty on Engineer, but we disagree. Unlike *Village of Cross Keys*, this case involves an underlying web of contracts that allocates risk and liability. In *Village of Cross Keys*, the architect and developer used the curtain wall design specifications they found in a trade magazine. They had no opportunity to negotiate a contract with the manufacturer regarding the cost or remedies. There was no competitive bidding process or contract governing liability. Here, by

28

contrast, Contractor had the opportunity to review Engineer's design, ask for clarifications, and submit a bid detailing how much it would cost to construct the project. In other words, Contractor was able to evaluate whether it could complete the project and at what cost, and the City was free to accept or reject its bid. If Contractor was not satisfied with the City's contract, it could have negotiated different terms or bid on a different project.

Contractor also included in its complaint a "Restatement (Second) of Torts § 552" count. This Restatement section describes a type of negligent misrepresentation, and was cited with approval in our discussion of duty and what constitutes a privity equivalent in *Swinson v. Lords Landing Village Condominium*, 360 Md. 462 (2000). We said:

> One "equivalent" is stated in § 552 of the [Restatement (Second) of Torts] (1965), which, in relevant part, provides that (1) a person who, in the course of its business, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance on that information, if the person fails to exercise reasonable care or competence in obtaining or communicating the information, and (2) the liability of a person who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

*Id.* at 477. This description of a privity equivalent, like others, still depends upon judicial recognition of a tort duty. But we have already concluded that the privity-equivalent intimate nexus test does not apply to large-scale government construction projects such as this one because the complex web of contractual arrangements predominates and injecting a tort duty is not in the public interest.

29

## CONCLUSION

We apply the economic loss doctrine and decline to impose tort liability on Engineer for purely economic injuries alleged by Contractor that was neither in privity nor suffered physical injury or risk of physical injury.  Accordingly, we affirm the judgment of the Court of Special Appeals.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.**